COMSTOCK *v.* McDONALD.

PARTNERSHIP—RETIRING PARTNER—PURCHASE OF SHARE—GIFT—
NOTES — INTEREST — INVESTMENT BY PARTNER — CONSENT OF
FIRM—SALARY TO PARTNERS—DEATH OF PARTNER—DISSOLUTION
— COMPENSATION OF SURVIVING PARTNERS — PARTNERSHIP
REALTY—DISTRIBUTION ON DISSOLUTION—PERSONALTY—PARTI-
TION.

* 1. Complainants, who were brothers, and one B., were equal
partners, and owned a large amount of pine lands, lumber,
and other property, worth about $1,000,000. B. offered to sell
his interest for $300,000. Complainants and the decedent,
their brother, a young man without means, purchased the
interest. Fifty thousand dollars was paid in cash and other
property by the complainants. For the balance of the pur-
chase price several notes were given, signed by the partners
as individuals, and not as a firm. These notes were paid out
of the assets of the firm, and the entries of such payments
made upon the books of account. Joseph died, and complain-
ants filed a bill for an accounting. The defendants claim
that complainants by the transaction made a gift to Joseph of
a one-ninth interest in the partnership property and business,
which interest was then worth over $100,000. The sole evi-
dence to support this claim is the entries upon the books,
which it is claimed are consistent with that theory, and with
no other. *Held*, that the books are not conclusive evidence
of such gift; that the other testimony shows that Joseph did
not regard the transaction as a gift, but as a purchase by him,
and that that evidence must control.

2. The interest paid upon the notes given by the three brothers
was a part of the purchase price, and the estate of Joseph
must pay its share thereof.

3. Under the facts stated, the expenditure of $17,165.25 is *held*
to have been a partnership transaction, and the investments
made therewith to belong to the partnership.

4. Where each partner has, by mutual consent, drawn from
the partnership each year a certain amount as salary, the
death of one partner terminates the arrangement, and upon
a partnership accounting each is entitled to receive the salary
to the time of the death.

* Head-notes by GRANT, J.

5. The surviving partners, under the facts in this case, are not entitled to compensation for services rendered in closing up the affairs of the partnership.

6. Complainants, in appropriating notes bearing interest, charged themselves with the amount of accrued interest. They also appropriated notes bearing no interest. *Held*, that in the accounting they should be allowed a discount upon such notes as bore no interest, and were not due when appropriated.

7. After all the partnership debts have been paid, and all that remains is the division of the property, including the real estate, among the partners, *held*, that the real estate resumes its character of realty, and the partners are entitled to a partition of the lands.

8. Where the division of the personal assets is difficult, the surviving partners are authorized to sell such assets and divide the proceeds.

Appeal from Alpena; Kelley, J. Submitted January 8, 1901. Decided March 26, 1901.

Bill by Andrew W. Comstock and William B. Comstock, surviving partners of the firm of Comstock Brothers, against George R. McDonald, administrator of the estate of Joseph B. Comstock, deceased, and others, for an accounting. From the decree rendered, complainants appeal. Modified.

*Frank Emerick* ( *Russell C. Ostrander*, of counsel ), for complainants.

*McDonell & Hall*, for defendants.

GRANT, J. The main issue in this case is sufficiently stated in 113 Mich. 626 (71 N. W. 1087). It is now before us for final hearing upon the proofs. The record is voluminous, and contains 1,480 pages. Accurate books of account were kept, in which were entered all the transactions of the firm in their dealings with others, and also with each other, so far as the amounts drawn out by each of the partners are concerned. The following questions are submitted for determination:

1. In the purchase of Mr. Bewick's interest by the three brothers for $300,000, did Joseph agree to pay one-third of that amount, to be taken out of his share of the profits and assets of the firm, or did complainants make him a gift of a one-ninth interest in the firm?

2. Should his estate be charged with one-third of the interest paid upon the notes given by the three for the purchase of the Bewick interest?

3. Should a deposit in the Detroit Savings Bank, amounting to $17,165.25, be charged wholly to the complainants, or to the firm?

4. Should the estate receive $625 as salary due Joseph for $7\frac{1}{2}$ months of the year in which he died, or $1,000, to cover the entire year?

5. Are complainants entitled to salary or compensation for services since the death of Joseph, during the settlement of the estate?

6. Should complainants be credited with the sum of $956.46 for discounts on notes not drawing interest, taken by and charged to them on maturity?

Complainants, for some time prior to 1867, carried on a lumbering business under the firm name of "A. W. Comstock & Company." In 1867 Charles Bewick became an equal partner. The firm name then became "Bewick, Comstock & Company." The business consisted of lumbering, banking, and carrying trade by vessels. They had no written articles of partnership. The business was very successful, and, as stated in the former opinion, in 1886 its property was estimated to be worth nearly $1,000,000. In that year Mr. Bewick offered to sell out to his copartners for $300,000. The offer was accepted, and Joseph became a purchaser of one-third of Mr. Bewick's interest. He thus became the owner of a one-ninth interest, each of the other partners owning four-ninths. The new firm was known as "Comstock Brothers." Bewick made no bill of sale of the personal property to the new firm, but executed deeds of the real estate. Fifty thousand dollars was paid in cash, each of complainants contributing $15,000 of that amount; the other $20,000 being paid by the money of the firm. Six notes were executed, signed by each of the brothers

individually, aggregating in all $250,000, payable in one, two, and three years. Subsequently, at the request of Mr. Bewick, one of these notes, amounting to $25,000, was taken up, and a note in the firm name given in its place.

It is the contention of the defendants that the books of account were kept upon the theory that the purchase price was paid out of the assets and profits of the firm, and that these books conclusively show that Joseph was to pay nothing for his interest. It is the theory of the complainants that the books do not necessarily sustain this theory; that Joseph purchased this interest, and agreed to pay therefor $100,000; and that in the settlement the purchase price should be charged against him. The court below sustained the claim of the defendants.

Defendants invoke the rule that when the books of a copartnership clearly show the relative rights and interests of the partners, as well as the respective claims or contentions which they made relating to the same during its existence, nothing short of documentary evidence should be allowed to change such rights and interests as they appear upon the books. · This rule is conceded by counsel for the complainants, but they insist that the authorities upon which the rule is based present no such case as that presented by this record.

1. We do not think it necessary to enter into a discussion of the science of bookkeeping, to which counsel for defendants have devoted a considerable part of their brief. We cannot reach the conclusion that the entries upon the books are so clear as to show conclusively that complainants and Joseph understood that the former were making a gift to the latter of an interest in their business and property, which they had been many years in accumulating; that interest being worth at least $100,000, and probably more. Such magnanimity, even between brothers, is not common. He who asserts such a magnificent gift should be able to point to conclusive evidence to sustain it.

126 MICH.—10.

The proof relied upon is found entirely in the manner of keeping the accounts, and counsel for defendants state that the entry in the "capital stock" account furnishes the most important evidence.  All the parties and all the witnesses to the transactions in the purchase of Bewick's interest, and the admission of Joseph as a partner, are living, except Joseph.  All have been witnesses, and it is singular that not one has testified to any statement made at the time, either by Joseph or the complainants, that they were making Joseph a gift of a one-ninth interest in the business and property which they had been so many years in establishing and accumulating.  The books of Bewick, Comstock & Co. contain no account of "capital stock" until August 15, 1883, on which date appears the following entry:

August 15th, 1883.
Sundries, to capital stock................................. $39,000
A. W. Comstock & Co., to bal. transferred...........$26,000
Chas. Bewick......................................... 13,000
Sundries, to capital stock.................................   24,000
A. W. Comstock.......................................   8,000
W. B. Comstock.......................................   8,000
Chas. Bewick, agreement..............................   8,000

No other entry of "capital stock" was made until August 4, 1886, when the following entry was made:

August 4th, 1886.
Capital stock.........................................$300,000
To Chas. Bewick......................................$300,000

On August 5, 1886, the bookkeeper made the following entry:

Chas. Bewick, to sundries.........................$300,000
A. W. Comstock....................................... $15,000
1-6 of San Diego.......................... $5,000
1-4 of Alcona............................. 10,000
W. B. Comstock.......................................   15,000
1-4 of Alcona............................. 10,000
Cash ..................................... 5,000
Alpena Banking Company...............................   20,000
Bills payable .......................................   250,000
            Notes as on bill-book.

This entry stood until January 12, 1893, when the following entry was made:

Jan. 12th, 1893.

Profit and loss_____$237,000

To capital stock_____$237,000

To balance the account, as it represents nothing.

Whatever the entry of August 4th may mean, it does not seem to us conclusive evidence that the complainants were to pay the entire amount of the Bewick purchase, and make a donation of one-third of it to Joseph. We think the explanation given by the complainants' counsel the reasonable one:

"When Harry Bewick on August 4, 1886, charged, 'Capital stock, $300,000,' and credited Charles Bewick with the same, his only idea was to give Bewick a credit to balance what was being charged to him, namely, the $50,000 paid down, and $250,000 credited 'bills payable.'"

It is unnecessary to enter into a further discussion of the entries on these books, and the deductions drawn therefrom by counsel for each side. We think it proper to look elsewhere to determine what the real transaction was. In doing this it is unnecessary to consider the testimony of the complainants; or to determine whether their testimony is competent under the circumstances of its introduction.

The six notes given to Mr. Bewick for $250,000 were not, upon their face, partnership notes, but were notes of the individuals, and upon their face imported that each was to pay one-third of the amount. 1 Bates, Partn. § 452; 17 Am. & Eng. Enc. Law, 1031. On these notes, therefore, Joseph was equally bound with the others. The manner of giving these notes is of no little significance, because it appears that they were the only notes or contracts ever given by the firm which were not signed, "Comstock Brothers." One of the notes for $25,000, at the request of Mr. Bewick, and for reasons which throw no light upon the relations between the

brothers, was subsequently surrendered, and a firm note
given in its place. Both Charles Bewick and his son
Harry testified that, in the conversation at the time of the
sale, the three brothers purchased his interest. On direct
examination, Charles Bewick testified:

"On this purchase each was to get one-third of my
interest, and each was to pay $100,000. Joseph had no
money, and they said we had a good deal of lumber and
logs on hand; as they would sell and get the money,
these notes would be paid from the proceeds. In talking
that over with Joseph, my recollection is that it was to be
charged up to his account, — the purchase, — and his
share would be paid out of his ninth interest."

On cross-examination he testified: "He [Joseph] said
that A. W. and William B. had sold him one-third of
my interest."

Harry Bewick testified that his father made a proposi-
tion to sell his one-third interest in the business, which
was accepted, and that:

"When the papers were to be drawn up, they notified
me that they had sold Joe Comstock one-third of my
father's interest. As I understand it, they agreed to let
Mr. Joe Comstock in on the same basis as themselves.
At the time when it was talked over as to who would
purchase from my father, Joe, A. W., and Will were all
in the office, and each was to pay to my father $100,000.
* * * The deeds were made out to Joseph B., A. W.,
and W. B. Comstock."

Balfour Lee testified to a conversation with Joseph a few
days after he had become a member of the firm, and con-
gratulated him upon it. The witness testified: "He
[Joseph] said that he had it all to pay for yet."

One Benjamin C. Jolly, who kept the books of Com-
stock Bros. from September 15, 1890, to September 15,
1892, testified to a conversation with Joseph in the spring
of 1892; that Joseph told him "that, when Bewick sold
out, he was taken in as a partner, getting a third of his
interest, for which he was to pay a hundred thousand
dollars. He said his interest was worth $60,000. He

said he had still to pay his $100,000, but after doing so his interest would be $60,000." This statement corresponds with the theory of the complainants, — that Joseph obtained his interest in the partnership by purchase, and not by gift.

To sustain the contention of the defendants would be to disbelieve the testimony of these four witnesses, and draw deductions from entries upon the books which upon their face are silent as to how Joseph obtained his interest,—books which upon their face do not even show that he was a partner; for the books continued right along, without change of name or balancing of accounts. It is entirely reasonable and consistent with the books and the evidence above given that neither party considered it necessary to place the exact transaction upon their books, which they might easily have done. The business continued to be carried on the same as before. No new books were opened and kept. We think it is established by a fair preponderance of the evidence that Joseph was to pay for his share, and in the final settlement it should be charged to him.

The authorities cited and relied upon by the learned counsel for the defendants do not, we think, go so far as to exclude parol testimony in this case, or to make the accounts upon the books conclusive.

In *Adams* v. *Gordon*, 98 Ill. 598, there were written articles of partnership, specifying that the two partners had contributed capital stock to the sum of $20,000. The articles provided that the copartners "shall share equally in stock and all profits and losses that may accrue in their business during the continuance of their copartnership," and that, upon the winding up of the concern, all gains and increase in stock were to be divided between them, share and share alike. One of the partners died. The other partner sought to prove that he had put in more of the capital stock than the deceased partner. No credit was given upon the books to the surviving partner. Two partial settlements had been made, in which no such claim

had been made. The court said: "There is no evidence that even tends to show that the partners were not equal owners of the sum 'delivered in' as capital stock."

In *Knapp* v. *Edwards*, 57 Wis. 191 (15 N. W. 140), there were no profits or losses aside from the destruction of the property by fire. The firm had no assets except some real estate, and no debts. The plaintiff's investment had been fully accounted for by sums drawn out by him and by loss by fire. The defendant had put in more capital than the plaintiff. It was held that plaintiff was not chargeable for any sum beyond his investment. The reasoning of the court is this:

"Neither is the defendant entitled to be allowed any more than he has already received from the firm, although he invested in the business more money than did the plaintiff. This is so because the firm met with no losses other than by the fire, and hence it would be unjust to require the plaintiff, in addition to losing his whole investment, to pay several hundreds of dollars to his partner. It being settled that the firm made no profits and suffered no other loss, the plaintiff cannot be held chargeable for any sum beyond his investment."

In *Cunningham* v. *Smith's Ex'rs*, 11 B. Mon. 325, books of account had been kept to show the correct amount of purchases and sales. It was sought to charge one of the partners with from 25 to 30 per cent. more, because other concerns in the like business had made large profits. The books were kept under the general superintendence of both partners, and, as the court said, "furnish evidence of a high character between them, and which has not been successfully impeached." It was therefore held that the general evidence of the profits made by others was inadmissible.

All that is decided in *Ryder* v. *Gilbert*, 16 Hun, 163, is that, in the absence of evidence of the precise amount of the respective shares of the partnership, the presumption is that they are entitled equally. The question arose under a proceeding for the distribution of the proceeds of an execution sale against one of the partners.

In *Griggs* v. *Clark*, 23 Cal. 427, it was held that, in the absence of any special agreement, the rule of law is that the partners share equally in both profits and losses. The mere fact that partners had put in unequal amounts of capital will make no difference in the rule. The evidence whether there was a special agreement was conflicting.

In *Van Ness* v. *Van Ness*, 32 N. J. Eq. 669, it was simply held that where a member of a firm, whose duty it is to keep the accounts, claims to have omitted to enter credits to which he is entitled, he must make satisfactory proof of such mistakes.

*Topliff* v. *Jackson*, 12 Gray, 565, goes no further than to hold that the books of the partnership are *prima facie* evidence against each partner.

2. It follows from the conclusions above reached that the estate of Joseph should be charged with one-third of the interest paid upon the notes given by the three brothers for the purchase of Bewick's interest. The interest upon these notes is as much a part of the purchase price as was the principal.

3. On the 1st day of May, 1893, Comstock Bros. had a deposit in the Detroit Savings Bank amounting to $17,-165.25. During that month A. W. Comstock drew a check for $5,000 against this account, and used it for his own purposes. For it he gave his individual note to Comstock Bros., payable one year from date at the office of the Alpena Banking Company. It was paid there on May 7, 1894. Joseph, of course, knew of this, for he was the manager of the bank. For some reason, the note was not entered upon the books of the bank or of Comstock Bros. The balance of this account was also drawn out by A. W. Comstock. The sum of $15,000 of the firm's money was loaned by A. W. Comstock to three concerns in Sioux City, Iowa, upon three notes, for $5,000 each,— one executed by D. T. Hedges, another by the Stock-Yards Company, and the third by the Dressed Beef & Cattle Company. These three concerns were jointly interested in business in Sioux City. They failed, and, in

place of the notes, $15,000 in stock of the Credit Commutation Company was issued to the Alpena Banking Company. Joseph knew of this transaction, and it was partly, at least, conducted through him. Assessments were afterwards made upon this stock amounting to $1,275, making the total amount invested in that concern $16,275. This stock was transferred to Comstock Bros. September 20, 1897; the original certificates being retired, and new ones issued instead. The Alpena Banking Company also subscribed and paid for $1,500 first-mortgage bonds of a concern known as the Combination Bridge Company, with semi-annual coupons at 5 per cent. per annum. The bonds were delivered, and the coupons paid as they matured. This bridge company was one of the properties of the commutation company, which owned the franchise for building the bridge. The subscription was made to protect the stock of the commutation company.

The circuit judge said that the evidence did not clearly satisfy him that "this $17,000, or some part of it, did not go into that transaction." Neither the books of the banking company nor of Comstock Bros. show what particular moneys were loaned for the above three notes. Mr. A. W. Comstock testifies positively that the money drawn from the Detroit Savings Bank was finally used for that purpose. We find nothing in the record to justify the conclusion that he testified untruthfully, or that he acted dishonestly in the matter. Without entering more into detail, we are satisfied that it was; that this was a partnership transaction; that each partner must bear his proper share of the investment, and is entitled to his share of the bonds and stock, or the proceeds thereof if sold.

4. Each year during the partnership, each of the complainants was credited on the books with $4,000, and Joseph with $1,000. Seven and a half months of the year in which Joseph died had expired at his death. The complainants having credited his account with $625 for that time, being his salary at the rate of $1,000 a year, the cir-

cuit judge rejected this item, holding that it should be $1,000, on the theory that the $9,000 thus credited each year was a division of the assets, and did not represent expenses as salaries. He was clearly in error. The evidence shows that these items were yearly entered in the expense account as salaries, and were so considered by all the parties. The partnership was dissolved by the death of Joseph, and this agreement to pay salaries was also terminated by the dissolution. Each partner should therefore be credited with his salary for $7\frac{1}{2}$ months only, and not for a full year,—each of the complainants at the rate of $4,000 a year, and the estate of Joseph at the rate of $1,000.

5. It is strenuously urged that the complainants are entitled to compensation for services rendered by them in closing up the partnership affairs after the death of Joseph, and that the allowance to each of salaries during the lives of all the partners is evidence of an agreement that the salary should continue to the surviving partners. There is nothing in the record to indicate that this payment of salaries was to continue after the dissolution of the partnership. As we have already held, that arrangement ceased with the dissolution. One of the risks assumed by the partnership is dissolution by the death of either; and the implied contract is that the survivor shall wind up the affairs of the concern without extra compensation. 2 Bates, Partn. § 772; *Loomis* v. *Armstrong*, 49 Mich. 521 (14 N. W. 505); *Porter* v. *Long*, 124 Mich. 584 (83 N. W. 601). The death of one partner often undoubtedly requires the employment of others to do his work, and this expense comes out of the general fund; but, except in very extraordinary cases, courts of equity will not allow a surviving partner compensation for his services. We do not find that the complainants in this case did any more in winding up the affairs of the partnership than the law and their contract of partnership required of them. Their claim for such services is therefore disallowed.

6. The complainants took and charged themselves with certain notes, some of which bore interest and others of which were without interest. They appear to have been charged at their face value. The court below correctly held '(and of this complainants do not complain) that they are chargeable with the accrued interest upon the interest-bearing notes at the time complainants took them. Complainants also asked to be allowed a discount upon those notes which they took before due, and which' bore no interest. This amount is, as stated by the circuit judge, $956.46. We think the judge in error in finding that the interest had been deducted at the time they were appropriated by the complainants. If this were so, his conclusion would be correct. We think it just and equitable that complainants should be allowed this amount.

7. The decree provides for a partition of the firm lands and the division of the personal assets. The assets consist of about 48,000 acres of pine land in Mississippi, stump lands in Michigan, lots in Alpena, vessel property, and a large amount of bills receivable, stocks, bonds, and mortgages. The debts have all been paid. The complainants insist upon the right to sell all these assets, personal and real, and to divide the proceeds between the surviving partners and Joseph's representatives. They insist that the real estate belonging to the partnership is personalty.

The authorities cited and relied upon by counsel for complainants from this State do not decide the question. They all hold (and such is the established rule) that real estate is personal property for the purpose of settling and paying the debts of the partnership. In *Way* v. *Stebbins,* 47 Mich. 296 (11 N. W. 166), it was held that partnership lands are to be equally divided among the survivors and the heirs of the deceased when there are no partnership debts to be satisfied. In England all the partnership assets are held to be personalty, and, after the payment of partnership debts, must be divided as person-

alty, and go to the representative, and not the heir.    The authorities in this country have not been uniform as to the character of real estate of a partnership after the partnership debts are paid.    Story, Partn. § 93.    There are authorities which hold that either partner is entitled to have all the assets sold and the money divided; but the weight of authority in this country is to the contrary. Bates says:

"Equity will not go further, and convert it [realty] into personalty for additional purposes, such as for the mere purpose of division, unless the intention to convert for more than partnership purposes appears; hence, in this country, the widow has dower out of a partner's share in the surplus, and the share goes to the heir, and not to the executor."    1 Bates, Partn. § 297.

The reasons for the English rule are stated in T. Pars. Partn. § 271.    That author states the rule in America to be that, after the real estate has been subjected to the payment of the debts of the partnership, what remains—

"Becomes at once real estate, or, rather, all the incidents and qualities of real estate revive.    This rule goes upon the ground of a trust imposed upon all who hold the legal title, in behalf of all partnership objects; and, that trust once discharged, the residue resumes its former character." T. Pars. Partn. § 272.

The decree of the court, therefore, as to the partition of the lands, must be sustained.    A division of the personal assets obviously would be very difficult, and, unless the parties can agree upon a division of these, we think the surviving partners should be authorized and directed to proceed to collect the debts due the firm, sell the personal assets, and divide the proceeds.

The decree will be modified and entered in accordance with this opinion.    Complainants will recover costs of this court.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred.    HOOKER, J., did not sit.