COMSTOCK *v.* McDONALD.[1]

PARTNERSHIP—SALE OF PARTNERSHIP REALTY—SECRET BONUS FOR
ASSENT TO SALE—FIRM ASSETS.

> Where the administrator and widow of a deceased partner re-
> fused to consent to a sale of partnership real estate at a price
> agreed to by the surviving partners, but later entered into a
> secret agreement with the prospective purchaser whereby he
> was to pay the agreed price for the property, and an additional
> sum to the administrator and widow in consideration of their
> assent, and the sale was completed accordingly, *held,* that the
> sum paid to the administrator and widow must be treated as
> an asset of the copartnership, and accounted for by the ad-
> ministrator to the surviving partners. MOORE, C. J., dis-
> senting.

Appeal from Wayne; Carpenter, J.  Submitted No-
vember 18, 1903.  (Docket No. 77.)  Decided May 17,
1904.

Bill by Andrew W. Comstock and William B. Com-
stock, surviving partners of the firm of Comstock Broth-
ers, against George R. McDonald, administrator of the
estate of Joseph B. Comstock, deceased, and others, for
an accounting.  From the decree rendered, complainants
appeal.  Modified.

*Frank Emerick,* for complainants.

*McDonell & Hall* and *Elliott G. Stevenson,* for de-
fendants.

HOOKER, J.  The complainants and a brother were co-
partners in a lumber business, the latter having a ninth
interest.  The copartnership was dissolved by the death of
the brother, and the bill in this cause was filed by the sur-
viving partners for an accounting and some other relief

[1] Rehearing denied October 27, 1904.

unnecessary to further mention. During the pendency of the cause, one Ryan sought to purchase certain timber limits in Canada belonging to the firm, and had negotiations whereby it was ascertained and agreed that the complainants would consent to an option upon said property for $500,000 if the widow and administrator of the deceased brother would do so. An interview was had with them, and they refused to consent, expressing the opinion that the property was worth much more, and the complainants informed Ryan that the deal could not be made. A day or two later, Ryan and the administrator made a written contract whereby it was agreed that the representative of the deceased brother would consent to a sale of said property for $500,000, in consideration of the payment to the administrator by said Ryan of the sum of $44,444.45 upon the consummation of said sale. The contract is as follows:

" Articles of agreement, made and entered into this 18th day of September, 1899, by and between M. Louise Comstock, of Alpena, Michigan, widow of Joseph B. Comstock, deceased, and guardian of his infant children, and George R. McDonald, administrator of said estate, parties of the first part, and Peter Ryan, of the city of Toronto, Ontario, party of the second part, witnesseth:

"*Whereas*, the party of the second part represents to the parties of the first part that he is the owner and holder of an option from Andrew W. Comstock and William B. Comstock, of said city of Alpena, survivors of the firm of Comstock Brothers, of said city, to purchase the property known as the 'Canadian Limits,' situated in and comprising the townships of Trill, Foster, Nairn, and Ermatinger, in the Dominion of Canada, for the sum of five hundred thousand dollars, according to and under the conditions named in said option; and

"*Whereas*, the said estate of Joseph B. Comstock is interested in, and the owner of an undivided one-ninth interest in, said property and limits, and is desirous of and willing to sell the same for what the parties of the first part deem a suitable price for such interest, which suitable price the said parties deem to be one hundred thousand dollars ($100,000) for such one-ninth interest:

" Now, therefore, the parties of the first part hereby

agree that in consideration of the sum of forty-four thous-
and four hundred and forty-four and forty-five one hun-
dredths dollars ($44,444.45), to be paid to them by the
party of the second part, in addition to the sum of five
hundred thousand dollars ($500,000) to be paid the said
Andrew W. Comstock and William B. Comstock under
such option, the same to be paid at the time and in the
manner hereinafter set forth, they will and do hereby as-
sent to such sale, and will use reasonable and speedy en-
deavor to secure, from the circuit court in chancery for
the county of Alpena, an order permitting the said Andrew
W. Comstock and William B. Comstock and said estate
to sell the said property and limits.

"The party of the second part hereby agrees that, in
consideration of the premises, he will pay to and into the
Bank of Montreal, of the city of Toronto, Ontario, to the
credit of said M. Louise Comstock, guardian and widow,
the said sum of forty-four thousand four hundred and
forty-four and forty-five hundredths dollars ($44,444.45)
concurrent with the transfer of said property, limits, and
the licenses therefor, and will pay to said Andrew W.
Comstock and William B. Comstock the further sum of
five hundred thousand dollars ($500,000) in addition thereto,
according to the terms and in the manner provided in
such option; the said money so paid into such bank to be
and become the property of said M. Louise Comstock, as
widow and guardian, at once upon the transfer of the
title of such property and limits to the said party of the
second part.

"In witness whereof, the parties have hereunto set their
seals and signed this agreement the day and year afore-
said.

"Mrs. M. LOUISE COMSTOCK,
          "Widow and Guardian.
"GEORGE R. MCDONALD,
          "Administrator.
"McDONELL & HALL,
          "His Attorneys.
"PETER RYAN."

The option was thereupon given, and read as follows:

"Articles of agreement, made this first day of Septem-
ber, 1899, by and between Comstock Brothers, of Alpena,
Michigan, of the first part, and Peter Ryan, of the city of
Toronto, Province of Ontario, party of the second part, as
follows:

"Said first parties agree to sell the timber berths numbers 94, 98, 99, and 102, known as the townships of Nairn, Foster, Trill, and Ermatinger, north shore of. Lake Huron district, Province of Ontario, for the sum of five hundred thousand dollars ($500,000) in lawful money of the Dominion of Canada, with New York exchange, payable as follows: The sum of ten thousand dollars ($10,000) cash in hand, the receipt of which is hereby confessed and acknowledged, and the balance, four hundred and ninety thousand dollars ($490,000), in New York exchange aforesaid, on or before the first day of November, 1899, at the office of the Crown Land Department, in the Parliament Buildings, in the city of Toronto. Said parties of the first part further agree that they will transfer said licenses for the above timber berths at the time and place and concurrent with the payment of said four hundred and ninety thousand dollars ($490,000).

"Said party of the second part agrees to purchase said property, and pay therefor the sum of five hundred thousand dollars ($500,000) at the time and in the manner above stated.

"It is, however, further agreed that said second party may, at any time before said first day of November, 1899, surrender to said parties of the first part this contract, by delivering the same, canceled, at the office aforesaid, and, in the event of said contract being surrendered, said parties of the first part shall keep and retain the said sum of ten thousand dollars ($10,000) as their own money, in consideration of their releasing said party of the second part from his obligations under this contract.

"If said party of the second part shall fail to pay said sum of four hundred and ninety thousand dollars ($490,-000) at the time, place, and manner herein agreed, then said failure shall be regarded by both parties hereto as an irrevocable election on the part of the party of the second part to surrender and abandon this contract, and this contract shall, upon said failure, become *ipso facto* void, and said ten thousand dollars ($10,000) shall be retained by the first parties for and as the consideration above stated.

"In witness whereof, the parties hereto have signed this contract, on the year and day first above written, in duplicate.

"Comstock Bros.
"Peter Ryan.

"Witnesses:  De Vere Hall.
              "Geo. Wm. Moore."

The following order was entered in this cause, then pending, by consent, viz. :

"At a session of said court held at the court-house in the city of Alpena, in said county, on the 2d day of October, A. D. 1899.

"Present: Hon. R. J. KELLEY, Circuit Judge.

"On reading and filing of a petition in this cause by the complainants, defendants consenting thereto, praying for leave to sell and transfer so much of the copartnership assets in said cause as are known and described as the timber berths or limits numbers 94, 98, 99, and 102, comprising the townships of Trill, Ermatinger, Foster, and Nairn, on the Spanish river and tributaries, in the Province of Ontario, to Peter Ryan, of the city of Toronto, Ontario, for the sum of $500,000, after consideration thereof, it appearing to the court that the complainants, under the name of Comstock Bros., by and with the consent of said defendants and their counsel, have entered into a contract and agreement with the said Peter Ryan to sell and dispose of such berths and limits for said sum, and that the title to the same stands in the name of Comstock Bros., and that said Comstock Bros. consists of the complainants herein and of Joseph B. Comstock, deceased, who is represented by the defendants herein, it is hereby ordered and decreed that the parties hereto be, and they are hereby, authorized to make a sale thereof for an amount not less than said sum, and that said complainants and defendants join in the execution of the papers and documents transferring and selling said berths and limits.

"It is further ordered and decreed that the interest of the said complainants in and to said limits is eight-ninths part thereof, and that they are entitled and authorized to receive such proportionate sum of the amount for which the same shall be sold to the said Peter Ryan, and that the interest of the defendant M. Louise Comstock, in her individual right and as guardian of said minors, in and to said limits, is one-ninth part thereof, and that she, in her individual right and as such guardian, is entitled and authorized to receive such proportionate sum of the amount for which the same shall be sold, under this order, to the said Peter Ryan; and that upon the payment to the complainants by the said Peter Ryan of eight-ninths of the amount for which the said limits shall be sold to him, and the payment to the said M. Louise Comstock, in her individual right and as such guardian, of one-ninth of the

amount for which said berths and limits shall be sold to the said Peter Ryan, and not less than the sum of ($55,-555.55) fifty-five thousand five hundred fifty-five dollars and fifty-five cents, that the complainants and defendants herein are hereby authorized to convey and transfer the said berths and limits.

" It is further ordered and decreed that of the said sum of ($55,555.55) fifty-five thousand five hundred and fifty-five dollars and fifty-five cents the said M. Louise Comstock is hereby required and ordered to deposit in her name, individually and as such guardian, the sum of ($20,000) twenty thousand dollars in the Bay City Bank, of Bay City, Michigan, and the further sum of ($20,000) twenty thousand dollars in the Wayne County Savings Bank, of Detroit, Michigan, and the further sum of ($15,555.55) fifteen thousand five hundred fifty-five dollars and fifty-five cents in the First National Bank of said city of Detroit, there to remain until the further order of this court: *Provided*, that so much of this order as relates to the payment of said sum to the said M. Louise Comstock shall, as against the said Peter Ryan, be satisfied by the payment to her of the sum of ($55,555.55) fifty-five thousand five hundred fifty-five dollars and fifty-five cents to the said M. Louise Comstock at the office of the Crown Lands Department, in the Parliament Building, in the city of Toronto, Ontario.

" It is further ordered and decreed that the aforesaid described copartnership asset, involved in this cause, be, and the same is hereby, eliminated from the other assets in controversy in said cause, and by this order and decree the same shall be treated as if a partition thereof were made of the same before sale thereof. This consent order and decree is in no wise to affect the further accounting and determination of the rights of the parties as to the remainder of the property and assets involved in this suit."

The purchase was made by Ryan, and the defendant ·administrator was paid the one-ninth share of the purchase price, and also the sum of $44,444.45, provided for in his contract with Ryan. It seems to be admitted that the arrangement between Ryan and defendant, whereby this one-ninth interest was made to produce $44,444.45 more than an equal share of the purchase price, was kept secret, and did not come to the knowledge of the

complainants until some time after the transaction was closed and the sale confirmed.   Upon the hearing of this cause, the matter was brought to the attention of the circuit court, which, acting under direction of this court (see 126 Mich. 155 [85 N. W. 579]), considered the question of the accounting; and a claim was made by complainants that this sum of $44,444.45 should be treated as an asset belonging to the copartnership.   The circuit court held otherwise, and the complainants have appealed.

Counsel for the defendants say that a dissolution of a copartnership by death makes the surviving partners trustees for the representatives of the deceased, but that there is not a similar reciprocal relation, and that the representative, having none of the authority of a copartner, has none of the obligations of such.   If it be admitted that the representative has no active share in the settling of the partnership business, we think that it does not follow that he owes no duty toward his intestate's copartners, but is at liberty to seek the furtherance of his own interests to the injury of theirs.   If it is true that he may sell his interest in each individual piece of property owned by the firm (which we do not affirm), and captiously insist on a bonus over and above his share of the proceeds of each piece of property that the surviving partners may seek to sell, enforcing the claim by a denial of their authority to sell, and threats to prevent it by litigation, it is not difficult to see that serious embarrassment, if not loss, to the others would result.

In the present case the defendants appear to have been correct in the opinion that the complainants were offering this property at too small a price, and no fault can be found on account of their objection to the sale.   The sequel has proved that the property was worth much more. Their opinion was confirmed by Ryan's willingness to pay a large additional sum.   Had this been communicated to the complainants, it is not improbable that it would have resulted in their selling the property for a sum more nearly

approximating its value; but, instead of this, defendant acted upon the assumption that he might sell his assent to the contract to sell for $500,000, and thus keep all of the additional price offered, to the exclusion of the other interested parties, who were allowed to complete the sale in the honest belief that the price was $500,000, whereas in fact it was $544,444.45.

The theory that this was a sale of the defendant's interest is fallacious. It is plain that it could not have been sold to Ryan, who wanted the entire property or none; and the agreement shows that the consent was to the sale of *all*, and payment of the $44,444.45 was conditional upon it. It is not difficult to see that the defendant might not have been able to realize as much out of the property in any other way; for it is shown that Ryan would not have given $900,000 for the property, and a sale for anything less than that sum would have made defendant's legitimate share less than $100,000. There was, therefore, a premium upon secrecy, both for Ryan and the defendant. Ryan bought the property for a low price, while defendant got the benefit of a high price; and this was accomplished by leading the complainants to believe the property was going for $44,444.45 less than the real price. If we are to say that the defendant in this case had the right to make such a contract as this, it is not easy to see why any copartner, not actively engaged in settling the partnership affairs, or his representatives or assigns, may not do the same; and that would mean that it is legitimate for copartners and their representatives to speculate out of copartnership assets at the expense of their copartners, and the consequences can readily be imagined.

We must treat this property as sold for the full amount received for it, and the bonus received by defendant as an asset of the firm, to be accounted for by defendant. In other respects the decree is affirmed. The complainants will recover costs of this court. The balance due complainants is a matter of computation, and will be fixed in the decree.

GRANT and MONTGOMERY, JJ., concurred with
HOOKER, J.

MOORE, C. J. (*dissenting*). I cannot reach the con-
clusion to which Justice HOOKER has arrived. The case
was heard in the court below by Judge Carpenter, now
Justice CARPENTER, who made so clear a statement of the
questions involved that I quote from the written opinion
he prepared in the case:

"This is a continuation of a suit for an accounting re-
ported in 126 Mich. 142 (85 N. W. 579). It is conceded
that defendants are entitled to a decree against complain-
ants, on the state of the accounts up to and including Sep-
tember 30, 1901, for $2,714.49, unless complainants are
entitled to participate in the distribution of a fund of $44,-
444.45, received by defendants under the following circum-
stances:

"Complainants and defendants, as representatives and
heirs of Joseph B. Comstock, deceased, owned certain
timber berths in the Province of Ontario. These berths
stood in the name of Comstock Bros. (the name in which
said complainants and said Joseph B. Comstock, prior to
his death, in 1894, had carried on business as copartners).
As the debts of said copartnership were only nominal,
these berths were owned by the parties in proportion to
their copartnership interests; that is, each of said com-
plainants owned four-ninths, and defendants, as repre-
sentatives and heirs of Joseph B. Comstock, owned one-
ninth.

"On August 24, 1899, one Peter Ryan, a prominent
timber dealer, residing at Toronto, Ontario, addressed a
letter to Comstock Bros., Alpena, Mich., requesting their
lowest price for said timber berths, stating:

"'I can sell them, if you will give me two months to overlook
them. Fires are now raging in your territory, and, though I am
not sure that there is any on your berths, yet you must realize that
settlers, hunters, Indians, and, worst of all, mining prospectors, are
very apt to do quite a lot of mischief.'

"Receiving no answer, on September 1st Mr. Ryan
wrote again, addressing his letter, as before, to Comstock
Bros., stating:

" ' May I ask you to let me have an answer to my letter of the 24th ? I am informed that townships of Foster and Nairn [two of the timber berths in question] have been on fire and much burned.'

"September 5, 1899, complainant Andrew W. Comstock answered the letters of Peter Ryan, stating:

" ' We are not anxious to sell our berths. The fires are not injuring them. We have a man on the ground watching them. That is our last report. We will sell the four berths for $500,000 net. If you wish to examine them, we will not sell to other parties while you are looking, or before November 1st. We will give no option to any one.'

" On receipt of this letter, Mr. Ryan dispatched men to examine the berths, and wrote the following letter:

" ' 8th September, 1899.

" ' Messrs. COMSTOCK BROTHERS,
            " ' Alpena, Mich.

" ' *Dear Sirs:* Yours of the 5th inst. at hand. I beg to say that I am sending my men to examine the berths, and beg to express my appreciation of your offer, and hope to be able to close with you before the time mentioned in your letter.

" ' Yours truly,
            " ' PETER RYAN.'

" Before this letter reached Alpena, complainant Andrew W. Comstock had left Alpena for Detroit, and the other complainant was in Toledo, Ohio, so that this letter was not received by complainants until after the interview next below mentioned had occurred between them and Peter Ryan. On the 11th of September said Ryan met said complainant Andrew W. Comstock in Detroit, for the purpose of securing a formal option in accordance with the correspondence above referred to. Said Andrew W. Comstock would not give said option until his brother, William B. Comstock, who was then in Toledo, Ohio, should give his assent to the arrangement. To secure this assent, said Ryan and Andrew W. Comstock visited Toledo on September 12th, and had an interview with said William B. Comstock, who approved the proposed arrangement. Either on the 11th of September or the 13th,—just which time it seems to me to be unimportant,—said Andrew W. Comstock informed said Ryan that he could not sign the proposed option until the defendants should yield their assent. This was the first information that said Ryan

had that the defendants had any interest in the timber berths in question. On said September 13th a formal option was prepared by the solicitor for complainants, whereby said Ryan was to have the right to purchase said timber berths on or before November 1, 1899, for the sum of $500,000. He was to advance $10,000, which was to become forfeited in case the berths were not paid for as agreed. It was arranged that said Ryan should leave his check of $10,000 either with Mr. Comstock or his solicitor, which was to be used by Mr. Comstock in the event of his signing said option, and not otherwise, and that his signing said option depended upon the assent of defendants to the proposed arrangement.

"On said 13th day of September, 1899, both Mr. Ryan and the complainant A. W. Comstock communicated by telephone with Mr. Hall, of the firm of McDonell & Hall, of Bay City, representatives of the defendants. This was the first intimation that any one representing the defendants had of the proposed sale. Mr. Hall declined to assent to the sale, on the ground that he believed the property to be of much greater value than $500,000. When he was assured that reports had come that the timber was damaged or threatened by fire, he stated his desire to examine said reports. Accordingly it was arranged that on the following Saturday, September 16th, he should meet said complainant Andrew W. Comstock at his office in Alpena, and examine said reports. In accordance with this arrangement, both Mr. Hall and his partner, Mr. McDonell, and their client, Mrs. M. Louise Comstock, had an interview with said Andrew W. Comstock at his office in Alpena. Together they examined the letters indicating that the timber had been damaged or was then threatened by fire. Defendants were not satisfied that it was for their interest to have the sale proceed. They stated to complainant Andrew W. Comstock that, according to his testimony given the previous December, said timber was worth $1,350,000, and according to the appraisal of his brother, and his own report as administrator of the estate of Joseph B. Comstock, deceased, the interest of said estate in said timber was worth $127,000. Mr. Hall, speaking for his clients, tried to induce complainant Andrew W. Comstock, at the expense of all parties interested, out of the funds of the partnership remaining in his hands, to have an investigation made to ascertain the then worth of said timber. Mr. Comstock declined to do this, and Mr. Hall then said,

'Mr. Comstock, that means that Mrs. Comstock has got
to adopt her own course to protect her interest in this prop-
erty;' to which complainant Andrew W. Comstock replied,
'That is right.' It was finally concluded that complain-
ants would advance to Mrs. M. Louise Comstock, widow
of Joseph, the sum of $500, to be charged to her account,
for the purpose of making an investigation (though this
advance, owing to the circumstances hereafter stated, was
not made), and a telegram was sent to Mr. Ryan, at To-
ronto, stating that, until this investigation was made, the
estate represented by defendants would decline to yield its
assent to the proposed arrangement.

"On Sunday, September 17th, said Peter Ryan, who
in the meantime had received the telegram last above re-
ferred to, called on Mr. Hall at his office in Bay City, and
represented to him that he had a valid and binding con-
tract with Comstock Bros.    Mr. Hall threatened to obtain
an injunction preventing the carrying out of this contract.
Mr. Ryan indicated his great anxiety to have the contract
promptly and faithfully executed, and asked Mr. Hall to
name a figure which would induce his clients to yield their
assent to the proposed arrangement.    In response to this
suggestion, Mr. Hall, assuming the value to be $900,000,
and a one-ninth interest in said timber to be worth $100,-
000, agreed, if Mr. Ryan would give $44,444.45, in addi-
tion to what they would receive as their one-ninth of the
$500,000, to advise his clients to consent to the option be-
ing executed in accordance with the arrangement already
made.    To this proposition Mr. Ryan finally gave his as-
sent, and on the following morning, in the city of Detroit,
a writing embodying this agreement was executed.    Very
shortly thereafter Mr. Ryan and Mr. Hall met complain-
ant Andrew W. Comstock, and Mr. Hall informed him
that the defendants yielded their assent to the proposed
arrangement, and subsequently on the same day the op-
tion prepared on the 13th of September was executed by
Andrew W. Comstock in the name of Comstock Bros.,
and delivered to Mr. Ryan, and the $10,000 check was
cashed.    Subsequently said Ryan sold said berths for
$937,000, and on or about November 1, 1899, carried out
his contract, both with complainants and defendants.
Nearly all of the berths were sold by said Ryan before
November 1, 1899.

"The question—and it is a question of law—is whether
or not complainants are entitled to eight-ninths of the

$44,444.45.  If the complainants had been informed, before they executed the option on the 18th of September, that the defendants were receiving this amount in addition to the one-ninth, and after such information had proceeded to execute the contract, no one could possibly contend that they had a right to participate in the fund in controversy. Their claim hinges, then, upon the neglect of defendants to disclose the receipt of this sum in addition to the interest in the $500,000.  Was there any obligation on the part of the defendants to make that disclosure to complainants? It is earnestly insisted by the learned counsel for complainants that the relation existing between complainants and defendants was one of trust and confidence.  Cases are cited holding that such a relation exists, not only between copartners, but between the representatives of deceased partners and the former partners of their intestate.  I have no doubt that such a trust relation often does exist.  If the representative of a deceased partner undertakes to deal with the assets of the partnership, respecting such an undertaking he occupies a relation of trust toward every one having an interest in said assets. The authorities cited in the brief of complainants' counsel relate, as I understand them, to such situations, and not to a case like that under consideration.  Here defendants did not undertake to deal with any asset of the copartnership, nor with any interest in which complainants were concerned.  They simply undertook, in their dealing with Ryan, to dispose of their interest—that is, the interest of the estate of Joseph B. Comstock, deceased—in the asset in question, and in truth they did not receive for that interest any more than it was reasonably worth, as shown by the amount realized by Ryan.  Defendants, so far as complainants were concerned, had a right to sell their interest in that asset for any price which they could get.

"Was there any obligation on the part of defendants to say to complainant Andrew W. Comstock, 'We are receiving from Ryan $44,444.45 in addition to one-ninth of this $500,000?'  Was Andrew W. Comstock in any position to say, 'I have been misled by your silence?'  It seems to me obviously not.  Complainants had fixed the value of this property at $500,000 for the purpose of making the deal with Ryan.  In fixing this value they had not consulted defendants.  They had consulted their own opinion and their own interests.  They had promised Ryan that he should have the land at that figure if the de-

fendants would assent. I am not sure that their letter of September 5th would not have legally obligated them to carry out that agreement. But, whether or not there was a legal obligation, there was the strongest kind of a moral obligation on their part to perform their agreement and to sign the option. It would not have been good faith on their part for them to have said to Ryan, ' Because you have paid defendants $44,444.45 more than their one-ninth of $500,000, you must also pay us eight times this amount, or we will not do as we have agreed.' Complainants, therefore, cannot truthfully say that they have been misled by the silence of defendants, because they have done only what they were bound to do by every principle of morals.

"This is not a case wherein it can be urged, that it was the duty of the defendants to make complainants acquainted with facts of which they were ignorant. This is not a case where silence was fraudulent. There was no trust relation which made it the duty of the defendants to speak. Complainants suffered no injury, because they did nothing but pursue a course which, in honor, they were bound to pursue.

"It results, therefore, that complainants, in my judgment, are not entitled to participate in the distribution of the fund in question, and that a decree should be entered in favor of defendants against complainants for $2,714.49."

I can add but little to what was said by Judge Carpenter. The case, briefly stated, is that Comstock Bros. were the owners of certain timber limits in Canada. After the death of one of the brothers, whose interest is now represented by the defendants, the complainants, who are the surviving partners of the firm, and who in the main had managed its affairs, and were very capable business men, thought it best to sell the timber limits, and offered them to Mr. Ryan for $500,000. It is clear the complainants thought that was all the limits were worth, and were willing to sell for that price, and to take eight-ninths thereof as compensation for the eight-ninths interest which they had in the lands. The widow of the deceased partner thought the lands were more valuable, and was not willing to have the lands sold unless she and her children, who suc-

ceeded to the rights of her deceased husband, obtained more than one-ninth of $500,000 for their interest. The record is barren of any testimony indicating that complainants were influenced in any way by any act of the defendants in fixing a price upon the lands at the time they gave the option to Mr. Ryan. By the arrangement entered into by the defendants with Mr. Ryan, the amount which was to be received by complainants was not diminished in the least. The complainants put one price upon the limits. The defendants and Mr. Ryan thought they were worth more. An arrangement was made which was satisfactory to the defendants and Mr. Ryan, by which the latter was able to carry out to the letter his agreement with the complainants. I cannot understand how the arrangement entered into by defendants with Mr. Ryan was wrong either in law or morals. Especially I cannot consent to the proposition that defendants, who declined to part with their interest in the limits for less than $100,000, and who received that amount for it, shall be compelled by a decree of this court to have upwards of $39,000 taken from the amount paid them and given to the complainants, when complainants have already received every dollar of value they placed upon their interest in the limits, and all they were to receive under their contract. To do so compels the widow and children to take for their interest what they were not willing to take, and gives to complainants nearly $40,000 more than they themselves asked for their interest.

I think the decree entered by the trial court was right, and should be affirmed.

CARPENTER, J., did not sit.