GRANT (WESTON et al., Interveners) v. FLETCHER et al.

(District Court, E. D. Michigan, S. D. July 1, 1922.)

No. 4003.

1. Partnership ⬅⮞244—Surviving partner is trustee.

A surviving partner is trustee for the heirs or representatives of the deceased partner with respect to the latter's interest in the partnership property and its direct proceeds, in whatever form, and on his death his legal representatives hold the same in the same fiduciary relation.

2. Partnership ⬅⮞246—On death of partner, his interest in lands of partnership descends as realty.

On the death, intestate, of a partner in a partnership not formed for dealing in real estate, his interest in lands owned by the partnership *held* to descend to his heir at law, while his interest in its personal property vested in his administrator.

3. Partnership ⬅⮞246—Heir at law of deceased partner entitled to accounting for proceeds of partnership lands sold by surviving partner.

Where the interest of a deceased partner in lands of the partnership descended to his heir at law, the proceeds of such lands, sold by the surviving partner, retain the character of real estate, and he is accountable therefor to the heir.

4. Wills ⬅⮞746—Devisee and legatee may maintain suit to recover property.

A sole devisee and legatee may maintain a suit in his own name to recover property of his testator withheld from him by a third party.

5. Dower ⬅⮞64—Right terminates on widow's death without assignment.

Where no dower interest in her husband's lands has been assigned to a widow during her lifetime, any claim thereto ends with her death, and any assignment or conveyance of her right, made during her lifetime, becomes ineffective.

⬅⮞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Partnership ⟨⟩317—Assignment by widow of partner held not a defense in suit for accounting.**

An assignment by the widow of a deceased partner of her statutory interest in his estate to a surviving partner cannot be used by him after her death in defense to a suit for a partnership accounting, to which her estate is not a party and where her husband's estate is still in probate court and unsettled.

**7. Partnership ⟨⟩328(1)—Consideration named in deed by partner prima facie evidence of its receipt, and burden on executor to prove contrary.**

In a suit against a surviving partner for an accounting, where he sold and conveyed partnership real estate, the consideration named in the deeds is prima facie evidence that he received that amount, and the burden rests on him, or on his executors after his death, to prove that he did not.

**8. Evidence ⟨⟩354(22)—Old books of account held admissible as to all entries after death of all parties concerned.**

Books showing partnership transactions during more than 40 years, kept by one partner, both before and after the death of another partner, *held* admissible in a suit for accounting, brought after the death of all the partners, as prima facie evidence as to all entries, both for and against the partner making the same, where, though inartificial and kept by a method peculiarly his own, they bore evidence of honesty of purpose.

**9. Partnership ⟨⟩311(3)—Settlements between partners held conclusive.**

Written settlements between partners, both of whom had knowledge or means of knowledge of the transactions covered, *held* conclusive between them in a suit for accounting brought nearly 40 years after the last settlement, and after the death of both parties thereto.

**10. Evidence ⟨⟩265(17)—Admissions against interest held admissible against successors in interest.**

Admissions of payment, made during litigation by one who then represented all parties on one side, one of whom was his wife, to whose interest he afterward succeeded, and who was in position to know the facts, *held* binding on the successors in interest of such parties.

**11. Payment ⟨⟩73(5)—Possession by maker of canceled note held evidence of its payment.**

Finding among the papers of a decedent of a note given by him nearly 30 years before his death, with lines drawn through the signature, *held* sufficient evidence of its payment.

**12. Partnership ⟨⟩317—Equitable set-offs allowable in suit for accounting.**

In a suit for partnership accounting, defendants *held* entitled to set off notes of complainant's ancestor, her predecessor in interest, which were proved and allowed against his estate.

**13. Partnership ⟨⟩246—Surviving partner accountable for individual profit from cutting timber from partnership lands.**

A surviving partner *held* accountable for a profit made from cutting of timber from partnership lands and manufacturing it into lumber.

**14. Partnership ⟨⟩246—Surviving partner may convey real estate.**

A surviving partner may sell and convey in his own name real estate, title to which .is in the partnership, and where his deed purported to convey the full interest he is accountable for the proceeds as partnership assets.

**15. Partnership ⟨⟩128—Consent of each partner necessary to engage in other business.**

A partner cannot bind the partnership to a venture outside the scope of the business for which it was formed, without the consent of each partner.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

16. Navigable waters ⊂⇒38—Made land formed by improvements in aid of navigation belongs to shore owner.

Improvements made by a riparian owner in aid of navigation, including made land formed as a result thereof belong to the shore owner as an accretion.

17. Partnership ⊂⇒246—Surviving partner accountable for proceeds of made land formed by accretion to partnership land.

A surviving partner, who handled and sold land formed by accretion to partnership land and received the proceeds is estopped from denying accountability therefor on the ground that the made land belonged to the state.

18. Partnership ⊂⇒246—Surviving partner accountable for property received in payment of debt due partnership.

A surviving partner, who received a conveyance of property in his own name in part payment of a debt due the partnership, held accountable to the partnership therefor.

19. Payment ⊂⇒44—Applied to oldest debt.

A surviving partner received a conveyance of property in part for a cash consideration and in part as security for a debt due the partnership. He realized sufficient from the property to cover his own investment and the partnership debt. Held, that the money so received would be applied in payment of the partnership debt, rather than to a later indebtedness from the debtor to him.

20. Partnership ⊂⇒333—Surviving partner on accounting held chargeable only with simple interest.

Defendants, on an accounting for partnership property sold by their decedent as surviving partner, where they did all possible to facilitate the accounting, held chargeable only with simple interest.

21. Costs ⊂⇒164(1)—Special allowance not authorized, in the absence of statute.

An extra allowance cannot be made to a party on account of expenses and attorney's fees, in the absence of some special statutory authority.

22. Costs ⊂⇒193—Defendants held not liable to contribute to complainant's expenses.

Contribution to complainant's suit expenses cannot be exacted from a defendant because he is incidentally interested in the fund recovered from him.

23. Partnership ⊂⇒253—Surviving partner not entitled to compensation for winding up business.

Ordinarily a surviving partner is not entitled to compensation for his services in winding up the partnership affairs.

24. Attorney and client ⊂⇒155—Percentage allowance made to counsel from fund recovered.

Where counsel for complainant devoted months at a time during a period of 14 years to a case, which involved an accounting respecting extensive partnership transactions covering more than 50 years, and without which labor no recovery would have been possible, and also advanced money for expenses of litigation, an allowance of such expenses from the fund recovered and 50 per cent. of the remainder for their services held reasonable and fair.

In Equity. Suit by Walter B. Grant, executor of the will of Albert W. Brown, deceased, with Robert D. Weston, administrator d. b. n. of the estate of William White, deceased and Marion E. Brown, administratrix d. b. n. c. t. a. of the estate of Frances M. Brown, deceased, as intervening complainants, against Frank W. Fletcher and Allan M. Fletcher, executors of the will of George N. Fletcher, deceased, and Frank W. Fletcher, Allan M. Fletcher, and Grace Fletcher King. Ex-

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ceptions by the parties to master's report, and petitions for special allowances. Decree for complainants.

See, also, 210 U. S. 82, 28 Sup. Ct. 702, 52 L. Ed. 966; 146 Mich. 401, 109 N. W. 686, 15 L. R. A. (N. S.) 632, 123 Am. St. Rep. 233; (C. C.) 140 Fed. 639; 182 Fed. 963, 105 C. C. A. 425.

Harrison Geer and Harold R. Martin, both of Detroit, Mich. (Walter B. Grant, of Boston, Mass., of counsel), for plaintiff.

A. C. Angell, of Detroit, Mich., for intervening plaintiff Weston.

Edward S. Clark, of Bay City, Mich., for defendants.

TUTTLE, District Judge. This is a case of unusual interest and importance. It involves business transactions originating more than 60 years ago, and the matters in controversy have been in litigation in the courts of Massachusetts and Michigan and the federal courts for nearly 50 years. All the original parties are now dead, and it has been necessary to establish the essential facts almost wholly from documentary evidence. The original litigation, commenced in the Massachusetts courts in 1874, ended with the opinion of the United States Supreme Court in May, 1908 (210 U. S. 82, 28 Sup. Ct. 702, 52 L. Ed. 966) which held that the Massachusetts litigation abated on the death of the defendant therein, George N. Fletcher, in November, 1899. The present suit was then instituted in this court in October, 1908, and has proceeded to the master's report on the accounting, which is now before me on exceptions and petitions of the parties for special allowances.

In the late 50's, George N. Fletcher was a resident of St. Clair, Mich., where he was the owner and operator of a sawmill. He was also the owner in his own right of several thousand acres of timber lands in Northern Michigan, which he had obtained by government patents. He had acquired skill and reputation as a practical lumberman. Thomas Campbell, of Boston, Mass., was a clerk in the office of the secretary of state of Massachusetts, where he had unusually good facilities for obtaining land warrants issued to soldiers who served in the Mexican and other wars. Fletcher had formerly lived in Massachusetts, and may have been acquainted there with Thomas Campbell. In any event, the two got into communication in 1855, as a result of which a contract was made between them, under date of March 13, 1856, whereby Campbell agreed to invest $6,000 and such further sums as he might elect in pine lands in the vicinity of Thunder Bay river, and its tributaries, in Northern Michigan. Fletcher was to give diligent attention to the selection, care, and sale of the lands, the locations of which were to be entered in Campbell's name. One-half of the expenses were to be charged to joint account, and at the end of three years, on six months' notice in writing, Campbell had the election, either to turn over the lands intact to Fletcher at cost, plus interest at 12 per cent. per annum, or to consider them as owned jointly by the two men, in which case the capital invested by Campbell was to be repaid, with interest, out of the first sales of the lands. Pursuant to this agreement, about 16,000 acres of pine lands were located in Campbell's name in the counties of Alpena, Montmorency, Alcona, Oscoda, and Presque Isle, in the

Thunder Bay region in Northern Michigan. The net amount advanced by Campbell as of August 1, 1856, was $16,050.26.

Campbell died intestate July 15, 1857, leaving as his sole heir at law his father, John Campbell. Campbell's sister, Eliza, had previously married William White, of Boston, Mass. White was state printer of Massachusetts, and a man of considerable standing. He was a prominent Spiritualist, and was the publisher of the Banner of Light, a publication of that sect. By a prior marriage, he was the father of one child, Frances M., who later became the wife of Albert W. Brown. The money which Thomas Campbell invested in the enterprise was probably largely borrowed from his brother-in-law, White, because, as shown by the account of the administrator of Campbell's estate, there was due from the estate to White $17,438.67. The correspondence of the time between the parties shows that White was advancing money to Campbell, and that Fletcher had some knowledge of this fact.

Thomas Campbell and Fletcher had planned and were trying to organize a company for the lumbering of their pine lands and the operation of a sawmill to be located at the mouth of the Thunder Bay river. The proposed company was to be called the "Thunder Bay Lumber Company." The plans for the organization of this company were interrupted by Thomas Campbell's death. Very soon thereafter White and James Campbell, who was a brother of Thomas Campbell and the administrator of his estate, expressed their desire to carry out the original plans, if possible. The matter was under consideration and discussion for a year or more thereafter. The original plans were never consummated, but certain features of them, as modified by the necessities of the situation, were finally reflected in an arrangement made in 1858 between Fletcher, White, and James Campbell, for the formation of a partnership. Apparently this arrangement enabled the parties to adjust the equities growing out of the dealings between Fletcher and Thomas Campbell, and also the indebtedness of the Thomas Campbell estate to White. One-half of Thomas Campbell's advances (which were a charge against the proceeds of the land, although not against Fletcher personally), with interest to September 1, 1858, amounted to $10,031.41, apparently computed as $10,031.37.

The agreement between Fletcher, White, and James Campbell bore date September 1, 1858, although it was probably executed on January 26, 1859. It is called the "partnership agreement," although the existence of a continuing partnership is a disputed question. It adopted the old name "Thunder Bay Lumber Company." The partnership agreement covered, not only the pine lands, but also certain "mouth of the river lands." Fletcher had acquired in 1855, in his own right, a one-half interest in about 460 acres of land at the mouth of Thunder Bay river, Alpena county, Mich., from one Bailey, which was known as the Bailey purchase, and which covered the most central and valuable portions of what afterwards became the city of Alpena. Its value as a town site was apparently less in the minds of its owners than its value as a site for water power sawmills. At the date of its purchase, it was still largely in its wild condition. Fletcher's co-owners were John Miner and John Oldfield, each of whom owned a one-quarter interest.

This purchase was supplemented in 1857 by the acquisition of the so-called "Eldred water power fraction," embracing certain water power and falls in the Thunder Bay river adjoining the Bailey purchase. The lands comprising the Bailey and Eldred purchases are what were known as the "mouth of the river lands," and which have been designated on the accounting in this suit the "city lots."

The following is the partnership agreement above referred to.

"Articles of agreement, this day made and entered into by and between George N. Fletcher, of St. Clair, Michigan, on the one part, and James Campbell, of Burlington and William White of Boston both in the commonwealth of Massachusetts of the other part, witnesseth: That the said parties mutually agree to form, and do by these presents form, themselves into a company for the purpose of manufacturing lumber at the mouth of Thunder Bay river, in the town of Fremont and state of Michigan, to be called the 'Thunder Bay Lumber Company,' with a capital stock of sixty-six thousand ($66,000) dollars, fully paid in, in manner and form as hereinafter described: One-half or thirty-three thousand ($33,000) dollars by George N. Fletcher, and thirty-three thousand ($33,000) dollars in equal parts by James Campbell and William White, as follows, viz.: By the said Fletcher fifteen thousand dollars, being his portion of fifteen thousand eight hundred and fourteen acres of pine lands now standing in the name of Thomas Campbell in the state of Michigan, and eighteen thousand ($18,000) dollars, being one undivided half of the Bailey and Lockwood and Miner purchases, so-called, of lands at the mouth of Thunder Bay river in said state, and thirty-three thousand ($33,000) dollars by James Campbell and William White, $15,000 in the lands, being the balance of the interest of the late Thomas Campbell in all the lands now standing in his name, situated as aforesaid, and the balance, $18,000, in cash. It is understood and agreed that all profits and losses of the said company shall be mutually and equally divided between the said Fletcher on the one part, and James Campbell and William White on the other part. And it is further agreed for the purpose of building a mill and carrying on the business of manufacturing lumber, that the said parties shall furnish such amount of capital as may be deemed advisable, one-half by the said Fletcher and one-half by the said Campbell and White, and if either party shall at any time furnish more than his proportional amount, then the said company shall pay interest for the same at the rate of 7 per cent. per annum. It is further agreed that the time of either party, when devoted to the special interests of the company, shall be allowed such compensation for his services as may be hereafter agreed upon.                    George N. Fletcher.
"William White.
"James Campbell.

"Witness:
    "H. W. Harrington.
"Boston, Sept. 1, 1858."

The effect of this agreement, whether it was performed, abandoned, or modified, the nature of the legal relations between its signers during the years which elapsed between its execution and the death of William White on April 20, 1873, and whether White's interest in the "mouth of the river lands" was a quarter interest or a half interest, are disputed questions. In respect to the "city lots" and a part of the pine lands in suit, the legal title always remained in Fletcher. The partnership agreement is therefore the foundation of plaintiff's claim, and is relied upon to take that claim out of the statute of frauds, as well as to establish plaintiff's interest.

Plaintiff's theory is that the figures expressed in the agreement were purely arbitrary, and that as a matter of fact the contributions to the

capital stock were made on an entirely different basis; that the pine lands were put in at a total valuation of $48,000, instead of $33,000, as stated in the agreement; that Fletcher's interest in the mouth of the river lands was put in by him at a valuation of $9,000, White contributing the remaining $9,000 by surrendering to Fletcher his obligation for that amount, originally due Thomas Campbell's estate, and assigned by his estate to White; that the provision for the investment of $18,000 in cash by White and Campbell was purely arbitrary; that no cash capital was paid or contemplated, and that the word "cash" was not used literally; that all of the pine lands and all of Fletcher's interest in the mouth of the river lands became vested in the partnership; that Fletcher, White, and Campbell were the owners of the partnership property in the proportions originally of one-half in Fletcher, and one-quarter each in White and Campbell; and that later this understanding was modified by eliminating Campbell from any interest in the town lands.

Defendants' theory is that the partnership agreement was always considered as partly executory, and that its full operation was suspended because of the nonpayment of the $18,000 cash capital due from White and Campbell; that it was finally modified or partially abandoned, leaving the parties as tenants in common of certain of the pine lands and city lots, but with their joint holdings reduced and their equities somewhat modified by their failure to carry out the original agreement. In my opinion, rendered January 6, 1916, on the questions relative to the nature and extent of the accounting, and the general nature and description of the property involved, I found as follows:

"Campbell had borrowed from one William White, of Boston (complainant's predecessor in interest), a large part of the money used in purchasing the land warrants with which these pine lands (the 16,000 acres) were located, and on later settlement between White and Campbell's estate, as shown by the account of the administrator of that estate, it was found that Campbell's estate owed White $17,438.67. Fletcher at that time was the owner of a half interest in the mouth of the river lands above mentioned, subject to a mortgage on that part of them known as the Bailey purchase, and subject to an unpaid balance on that part known as the Lockwood and Minor purchase.

"It thus appears that Fletcher owed the Campbell estate $10,031.37, which he had to pay before he could get title to his half interest in the pine lands, and that the Campbell estate in turn owed White the $17,438.67. In this situation, the parties, Fletcher, White, and James Campbell entered into a written contract which was dated September 1, 1858, but which was actually signed in January, 1859, the original of which contract has been produced in evidence, whereby they formed a partnership between themselves under the name of the Thunder Bay Lumber Company, with a capital stock fixed at the sum of $66,000, recited to have all been paid in, one-half, or $33,000, by Fletcher and one-half or $33,000, by White and Campbell, Fletcher's one-half was stated to have been paid in by a contribution to the capital of his one-half interest in the pine lands above mentioned, at a valuation of $15,000, and by his interest in the mouth of the river lands at a valuation of $18,000. White and Campbell's one-half was stated to have been paid in by the other one-half interest in the said pine lands, at a valuation of $15,000, and the balance, $18,000 in cash.

"I am satisfied from the evidence however, that this was not the actual manner in which the capital of $66,000 was contributed by the parties to this contract. The evidence shows, to my mind conclusively, that Fletcher paid his indebtedness of $10,031.37 to the Campbell estate by executing and delivering two written obligations, for $1,037.37 and $9,000, respectively, the

$9,000 obligation being passed from the Campbell estate to White in payment pro tanto of his claim of $17,438.67 against that estate, the balance of his claim, $8,438.67, being paid him by giving him a one-quarter interest in the pine lands, at a valuation of $7,500, and the balance of some $900 by a note of John Campbell, and that White surrendered this $9,000 obligation to Fletcher as a consideration for the latter's agreeing to contribute his interest in the mouth of the river lands to the partnership; all being pursuant to the understanding and agreement of the parties to the contract that the partnership should be the owner of the pine lands, and of all Fletcher's interest in the mouth of the river lands, Fletcher's indebtedness as represented by the $9,000 obligation being thereby satisfied and canceled, and the indebtedness of the Campbell estate to White being also thereby satisfied and canceled.

"As showing that this was the intention of the parties, the pine lands were actually appraised on the basis of $48,000 in the administration proceedings on the Campbell estate; that amount was recited as the consideration in the deed given under date of December 10, 1859, to Fletcher, White, and James Campbell by John Campbell, in whom the legal title to those lands had vested on Thomas Campbell's death, and James Campbell executed a bond, whereby, for a consideration stated as $24,000, he obligated himself to cause to be deeded to the three partners the said pine lands; the bond stating that these lands were contributed 'as the capital stock of James Campbell and William White.' In other words, while the contract stated that the interest in the pine lands contributed by Campbell and White was at a valuation of $15,000, this bond, executed under the same date, stated that the interest in these pine lands contributed by them was at a valuation of $24,000 exactly $9,000 more. This increase of $9,000, plus the $9,000 obligation, which the evidence shows was surrendered by White to Fletcher, exactly equals the $18,000 which the contract recited was paid in cash, but which I am satisfied was actually paid in the way mentioned. Of course, as White and Campbell's one-half of the pine lands was contributed on a basis of $9,000 more than the amount recited in the contract, it may be said that Fletcher's one-half interest in the pine lands should also have been increased $9,000, which, if not otherwise explained, would make his contribution on the basis of $42,000. Fletcher, however, owed $9,000 as represented by the $9,000 obligation, and I am satisfied from the evidence that in consideration of the surrender to him of that $9,000 obligation he agreed to contribute, in behalf of White and Campbell, one-half of his one-half interest in the mouth of the river lands; in other words, while the contract recited that he contributed his one-half of these lands at a valuation of $18,000, I am satisfied and find that he contributed one-half of these lands in his own behalf at a valuation of $9,000, and that he contributed the other one half in behalf of White and Campbell at a like valuation of $9,000 in consideration of the surrender to him by White of the $9,000 obligation. Just why the parties did not recite these transactions in their contract exactly as they carried them out, and manifestly contemplated carrying them out, I am unable to say; but I am satisfied that as a result of these transactions the full capital of the partnership, $66,000, was paid in, and that after the signing of the contract the partnership, composed of these three parties, was the real owner of the 16,000 acres of pine lands, and of Fletcher's one-half interest in the mouth of the river lands.

"Defendants' counsel on the oral argument and in their briefs have strenuously contended that the statement in the contract relative to the payment of $18,000 in cash by White and Campbell absolutely required them to actually pay in that sum in cash, and that because it was never actually fully paid in cash the partnership never came into active existence, and did not become and was not the owner of Fletcher's interest in the mouth of the river lands, legal title to which always stood in his name. They argue that, the partnership not having come into active existence because of the nonpayment in cash of the $18,000, the relation between the three parties as to the pine lands covered by the John Campbell deed above mentioned was that of co-owners, and not that of partners, and further that under the statute of frauds of Michigan no interest in the mouth of the river lands or in the pine lands outside of those embraced in the John Campbell deed vested in the three partners.

"As above stated, I am satisfied that the contract did not actually contem-

plate or require the payment by White and Campbell of $18,000 in cash towards the capital of the partnership. As further supporting this conclusion on my part, the correspondence between the parties following the signing of the contract, a great mass of which correspondence has been introduced in evidence, nowhere contains any reference to such a payment having been contemplated by the parties. The correspondence indicates that Fletcher, who was the managing partner on the ground, was in very straitened financial circumstances; but he never in any communication to White or Campbell stated that they were bound to pay over the sum of $18,000 in cash. His failure to request them to make such payment, if it had been intended they should make it, while on its face negative in character, nevertheless, under the circumstances, is to my mind positive evidence that there was no such understanding. Defendants' counsel have argued that this particular amount, $18,000, was desired for the purpose of building a dam; but the evidence shows that during the early years after the signing of the contract a dam was built by a company known as the Thunder Bay Dam Company, composed of Fletcher and his co-owners of the mouth of the river lands, one-half of the cost of which was in the first instance charged to Fletcher, and that one-half of the amount so charged to him was in turn by him charged to White and Campbell, and that as a result of the settlements between them they, White and Campbell, paid their said one-half. This, to my mind, shows that the furnishing of money to build a dam was not understood to be a condition precedent to White and Campbell's interest in the mouth of the river lands. Fletcher on his books of account, in which he entered the Thunder Bay Lumber Company transactions, did not charge White and Campbell with the $18,000, and he made no such charge against them in the accounts which were settled between the parties from time to time. All this, and other matters which it seems unnecessary here to recite, satisfies me that the contract did not contemplate or require White and Campbell to pay in $18,000 in cash, but that the full capital stock was actually paid in in the manner above set forth.

"Defendants' counsel argue, in effect, that to hold that the capital of the partnership was contributed in another way than that recited in the contract is to bring the case within the inhibition of the Michigan statute of frauds, and that the statute is a defense in this suit as to the mouth of the river lands, the legal title to which always stood in Fletcher, and as to the pine lands outside of the John Campbell deed. The rule is settled, however, by ample authority, that the statute of frauds does not apply to lands of a partnership which has actually been launched. The evidence shows conclusively that this partnership was actually launched, and therefore the statute of frauds constitutes no defense. The rule is well settled that a receipt is always open to explanation by parol evidence, and under this rule it was entirely competent for the complainant to show, in explanation of the recital in the contract, the manner of payment as actually made by them in the way above mentioned. The argument of defendants' counsel on the question whether the partnership was actually launched, and on the question whether the statute of frauds constitutes a defense, really hinges on the question whether the statement in the contract relative to White and Campbell paying in $18,000 in cash was literally correct, and, as I am satisfied that the statement is not literally correct, it necessarily follows that the contention of defendants' counsel is unsound. As the partnership was actually launched, it was competent for the complainant by parol evidence to show what lands belonged to the partnership, under the authorities.

"In the correspondence and in the partnership settlements had after the signing of this contract there is ample evidence to sustain the title of the partnership to both the pine lands and the mouth of the river lands. In some of the correspondence and in several of the settlements White is referred to as the owner of a half interest in the mouth of the river lands. As an illustration of this I refer to the Righter letter, to Fletcher's letter to his father-in-law, Miller, to the Emerson letter, to the Cushing letters, and to many others of like import. I am satisfied however, that where White is thus mentioned both White and Campbell were actually meant. White was probably more active in the partnership operations than Campbell, and it was probably

because of this fact that he alone was referred to, instead of White and Campbell.

"The complainant in this suit has argued, based on these references to White alone, and on the claim that White alone paid for an interest in the mouth of the river lands, and also based on other similar matters, that White actually became the owner of a half interest in Fletcher's interest in the mouth of the river lands; but I am satisfied that this claim is not supported by a fair consideration of all the evidence, for the reasons above stated."

Having found, by my said opinion rendered January 6, 1916, that a partnership, composed of Fletcher, White, and James Campbell, came into existence on the execution of the agreement dated September 1, 1858, and that this partnership became the owner of the 16,000 acres of pine lands, and of Fletcher's undivided one-half interest in the mouth of the river lands, I then called attention to the partnership settlements had thereafter, the last of which was on August 15, 1871, and to the prior partition of the mouth of the river lands in 1865, between the co-owners, whereby certain of these lands were set off to Fletcher, in behalf of the partnership. I also found that, by reason of the cancellation of certain of the locations of pine lands, the same were eliminated from the descriptions contained in the John Campbell deed, but that others were substituted for the canceled locations, as the result of which the partnership became the owner of the substituted lands, the descriptions of which were established by the evidence.

This decision has not been reopened on the present hearing, and still stands. The problems now before me grow out of the details of the accounting for the property in which plaintiff was given a one-quarter interest by the interlocutory decree. The intervening plaintiffs are intended to be included in the application of the word "plaintiff." The present hearing involves facts which occurred both before and after White's death on April 28, 1873. The transactions which occurred before White's death are now of minor importance.

Fletcher, White, and Campbell never built a mill and never manufactured lumber. The timbers for a mill frame were shaped and fitted prior to October 1, 1859, but the idea of building the mill was abandoned before the frame was raised, and the timbers were piled on the ground and were never used. They were still undisposed of in March, 1862, and were afterwards burned. The mill whose operations are referred to in the early correspondence was the Smith and Chamberlain mill, in which White and Campbell had no interest. No lumbering operations of any kind were ever carried on by Fletcher, White and Campbell. In the winter of 1859–1860 Fletcher contracted with two jobbers to cut some of the timber in which White and Campbell were interested; but the logs were later sold at the "Upper Rapids," so that they were neither sawed nor brought to Alpena by the partners. The entries on Fletcher's books show that the receipts for those logs approximately equaled the disbursements. The settlement of those items was reserved in the account of July 13, 1861, and nothing more was ever done about them, so that the result of this logging was never incorporated into the Thunder Bay Lumber Company settlements. These were the only attempts ever made by the partners (or by Fletcher in their behalf) to carry on any branch of the lumbering business. From

that time all activities in which they were interested were merely incidental to liquidation. Fletcher sold their timber and real estate, not because they were organized to deal or were actually dealing with real estate as a commodity, but because they had abandoned all idea of active business and were engaged in the process of liquidation and division. This process was slow, merely because times were "hard" and the market oversupplied. The abandonment of the original plans was expressly approved by White as early as June 5, 1860.

No interest in the mouth of the river lands was ever conveyed by Fletcher to either White or Campbell. A deed to Fletcher, White, and Campbell of the Thomas Campbell pine lands was executed by John Campbell (the father and heir at law of Thomas Campbell) on December 10, 1859, but was not recorded until August 2, 1872. The transactions between Fletcher, White, and Campbell during the 14 years which elapsed after the execution of the partnership agreement and before White's death were covered by certain written "settlements" between the parties, all of which are in the present record. Settlements were made as of various dates during this interval. At first the receipts for the property were not sufficient to pay the carrying charges and money had to be borrowed. Later the receipts from the sale of the lands increased, and at the time of White's death the receipts from sales were exceeding the disbursements. The last settlement prior to White's death was made August 15, 1871, as above stated.

William White died intestate April 28, 1873, leaving as his sole heir at law, with respect to his real estate, his daughter, Frances M. Brown, subject to the dower of his widow, Eliza, who, under the law of Massachusetts, also became entitled to one-third of his personal property; the other two-thirds going to the daughter. There seem to have been no serious disagreements between Fletcher, Campbell, and White prior to the latter's death, and the controversies now in suit developed thereafter. Almost immediately following White's death, friction developed between Frances M. Brown, his daughter, and her husband, Albert W. Brown, on the one side, and Mrs. Eliza White, the widow, James Campbell, and Fletcher, on the other. Mrs. White and James Campbell appear to have claimed that White's interest in the partnership lands was held in trust for their nephew, Newell R. Campbell, of whom White was guardian. This claim was strenuously disputed by Mr. and Mrs. Brown. Fletcher had some interviews with Mrs. Brown, at which he appears to have tried to settle the controversy. Mrs. Brown appears to have taken the position that she could not make any settlement until she knew what her father had owned. The settlement efforts were unsuccessful, and suit was soon afterwards commenced, on April 24, 1874, by Rufus H. Spalding, who had been appointed administrator of White's estate, against Fletcher, Mrs. White, and James Campbell, in the Supreme Judicial Court for Suffolk county, Mass., for a discovery and accounting with respect to the Michigan enterprise.

This was the commencement of the litigations which were bitterly fought in the Massachusetts courts from that date to Fletcher's death in 1899, and thereafter, after its conclusion in those courts, in the Michigan courts, and before the United States Supreme Court, ending

by the decision of the latter in 1908. Fletcher was personally served with process from the Massachusetts court, and appeared and filed an answer. By his answer, stated to be on information and belief, he denied that White had any individual interest in the Michigan enterprise, and alleged that White's interest therein was held as guardan of Newell R. Campbell. In May, 1874, Fletcher was examined by Spalding's attorney in the probate court of Alpena county, Mich., and testified that he held property in his hands (both pine lands and city lots) in which White and Campbell were interested, but expressed the opinion that they were interested in their representative capacities, meaning White as guardian of Newell, and both as executors under John Campbell's will; the latter having died in October, 1871. Fletcher on that examination annexed to his testimony a copy of the account of the Thunder Bay Lumber Company as kept on his books. This copy was made by Spalding's attorney from Fletcher's books. This account contained some items, subsequent to the settlement of August 15, 1871, which have since been the subject of serious controversy.

Soon after the commencement of the Spalding case, a bill of complaint was also filed in the Massachusetts court by Newell R. Campbell as complainant against Mrs. Brown and Spalding as defendants, for the purpose of enforcing a trust for the benefit of Newell R. Campbell in White's interest in the Michigan property. This case was commenced on May 31, 1875. Mrs. Brown filed a demurrer, on the ground that the trust alleged in the bill, being wholly oral, was void under the statute of frauds, and the bill was finally dismissed on this ground, on June 25, 1880. The opinion is reported as Campbell v. Brown, 129 Mass. 23. While this case was pending, Fletcher's position was that he was accountable to the proper persons when their identity was settled by the Massachusetts court.

After the Newell R. Campbell case was decided, the Spalding litigation developed into an apparently irreconcilable controversy between Brown and Fetcher as to the property owned by the partnership, the extent of White's interest therein, and the details of the accounting. Fletcher admitted his accountability, but he and Brown could never agree as to what property should be covered by the accounting, or as to what items should be included in it. The controversy was one of unusual bitterness, and the peculiar personalities of the two men contributed to this bitterness, and to the long delays involved. Plaintiffs consider George N. Fletcher responsible for the litigation and delay, and defendants insist that the responsibility lay with Brown. In my opinion the delays can be explained without questioning the good faith of either of the litigants. The magnitude and complexity of the task, the fact that both litigants acted without counsel on many of the hearings (Brown being a patent attorney, and Fletcher apparently being more self-reliant than wise), and the peculiar mutual reactions of their differing personalities were very conducive to delay.

Counsel now in charge of the case (none of whom had any part in the hearings which preceded Fletcher's death) have shown on both sides a commendable desire to shorten the record and to save delay. No time has been lost or wasted, and counsel have acted in a spirit of mutual accommodation and concession, which has greatly facilitated

and expedited my final decision. Notwithstanding this fact, it has required more than 6 years since the date of my interlocutory decree to complete the hearing, and I can easily understand how Brown and Fletcher consumed 25 years without concluding their controversy. This was primarily due to their personalities, and was their misfortune rather than their fault. When Fletcher died in 1899, Brown was still engaged in submitting his proofs to the commissioner.

In the Massachusetts litigation, a great mass of testimony was given, and a great mass of documentary evidence was introduced. One George M. Reed was appointed commissioner to take the testimony, and testimony appears to have been taken before him from March, 1875, to April, 1879. John Miner was also appointed to take testimony at Detroit, and testimony appears to have been taken before him from December, 1875, to January, 1879. In March, 1880, Francis W. Hurd was appointed master by the Massachusetts court, and testimony was taken before him from March, 1880, to May, 1884. As by my opinion, rendered January 6, 1916, I hold that Fletcher's testimony given on these hearings is incompetent as evidence in the present suit, as being equally within the knowledge of plaintiff's deceased predecessors, I feel that it would be improper for me at this time to state the nature of the controversies involved in these hearings. Hurd filed his first report as master in August, 1887, in which he passed upon the questions involved, after which the case was recommitted to him, in December, 1889, and he filed his supplemental report in April, 1891.

In the meantime Spalding had continued as the administrator of White's estate in Massachusetts, but for a few years removal proceedings were pending against him in the Alpena probate court, which finally resulted in his being sustained as administrator by decision of the Michigan Supreme Court in January, 1883. White v. Spaulding, 50 Mich. 22, 14 N. W. 684. James Campbell died in September, 1884, and Fletcher had acquired his interest in the partnership pine lands in 1880. How Fletcher acquired James Campbell's interest in the partnership city lots does not appear. Mrs. Brown, White's heir at law as to the real estate left by him, had not become a party to the Massachusetts suit, up to the time of Hurd's supplemental report in April, 1891. Fletcher had been in virtual control of the partnership property, and had been selling or cutting timber from the pine lands, and disposing of the city lots.

In this situation, the parties, Fletcher, Mrs. Brown, and Spalding, the administrator, under date of June, 1892, entered into an agreement for arbitration, under rule of court, a practice in vogue in Massachusetts, under which arbitration the matters in controversy were referred to the arbitration of Hon. William L. Putnam, United States Circuit Judge for the First Circuit. This arbitration agreement contained a provision to the effect that the decease of any party thereto should not revoke the submission, but that the arbitration should continue, and that the heirs and legal representatives of the parties should be bound by the final award, and that it was the intention of the parties by the submission to forever settle all controversies between them. Judge Putnam rendered his preliminary award under date of May, 1894, by which he found that White was the owner of a one-quarter interest in

the partnership property at the time of his death, and that Fletcher was accountable therefor. The accounting was then commenced, and continued from that time up to the date of Fletcher's death in November, 1899, at which time it was not completed. Mrs. White died testate January 5, 1898.

After Fletcher's death, his sons (who were the executors of his will and are two of the present defendants) were advised by their counsel, who had no previous connection with the litigation, that the Massachusetts court had no jurisdiction to enter a decree that would bind the estate in Michigan, and that proceedings de novo in Michigan could not be sustained. They offered Mr. Brown's attorney, John Miner, in settlement, the sum of $100,000. This was in the year 1900. George N. Fletcher had been to a large extent his own attorney, and there was no one living who had a comprehensive idea of his case. His proofs had not been completed, and his sons believed that they had no way of deciding how much equity there was in Brown's claim. They made the $100,000 offer on their counsel's advice that it should be "so large that, if it was not accepted, they would be acquitted of all improper motives in standing on technicalities." No reply was received to this offer, or to the request that Brown state the amount of his claim. Plaintiffs suggest, in this connection, that the accounting had not then been completed, or the amount of his claim fixed.

The present defendants thereupon refused to proceed with the Massachusetts litigation and permitted an award and a decree to be entered by default. Judge Putnam, after giving them notice to appear, proceeded to conclude the arbitration, and rendered his final award under date of February, 1903, upon which final decree was entered by the Massachusetts court in April, 1903, for about $400,000, in favor of Albert W. Brown (who had succeeded to the plaintiff's interests). This decree was then presented as a claim against Fletcher's estate in Michigan, which was in process of administration in the Wayne probate court, and was disallowed. Appeal was taken to the Wayne circuit court, where the disallowance was confirmed, and the matter was then successively reviewed in the Michigan Supreme Court (146 Mich. 401, 109 N. W. 686, 15 L. R. A. [N. S.] 632, 123 Am. St. Rep. 233), and the United States Supreme Court (210 U. S. 82, 28 Sup. Ct. 702, 52 L. Ed. 966), where the judgment of disallowance was affirmed in May, 1908.

In the meantime. Mrs. Frances M. Brown had died testate in December, 1902, by her will leaving all her property to her husband, Albert W. Brown. Prior to her death she had commenced an independent action in the federal Circuit Court at Detroit against the Fletchers, which was afterwards dismissed for want of prosecution. 140 Fed. 639.

After the decision of the United States Supreme Court in May, 1908, Albert W. Brown commenced the present suit in this court in October, 1908, against the executors of Fletcher's will and his children, who were his residuary legatees. The defendants filed pleas in abatement, setting up the former litigation in bar, and these pleas were sustained by Judge Swan in October, 1909. The Court of Appeals reversed that holding in January, 1911. 182 Fed. 963, 105 C. C. A. 425. Defendants then demurred to the bill on the ground of laches and the

statute of limitations. Brown, the original plaintiff, died in November, 1911, and the suit was revived in the name of the executor of his will, Walter B. Grant. The beneficiary under Brown's will is his daughter, Marion E. Brown, of Boston. Defendants' demurrer was overruled by me in January, 1913, when I filed an opinion setting forth my reasons. Defendants then answered on the merits. An examiner was appointed to take testimony, and commenced the taking thereof in the spring of 1913.

The taking of the proofs was interrupted by the defendants' contention that the suit was improperly brought by Brown in his individual capacity, and that the administrator of the White estate was the proper plaintiff. Arguments were had on this question before me, but I did not then definitely decide it, because an administrator of the White estate and a representative of the Frances M. Brown estate petitioned for leave to intervene, and were granted such leave. Thereafter the taking of the proofs continued on the question of the nature and extent of the accounting, and the general nature and description of the property involved, on which issues I rendered my opinion under date January 6, 1916. I there held that the defendants are accountable for White's one-quarter of the property belonging to the partnership at the time of his death, which property I therein identified.

My opinion was followed by a decree entered under date February 7, 1916, by which I referred the accounting to William S. Sayres, Jr., standing master in chancery. The accounting proceeded before him from that time until his report was filed January 10, 1922. It is on exceptions to that report that the matter is now before me, on a record consisting of about 10,000 pages of testimony and almost 3,000 exhibits. George N. Fletcher's testimony in the Massachusetts case as to matters which, if true, must have been equally within the knowledge of William White, was objected to by plaintiff and excluded by me as being "equally within the knowledge of" plaintiff's predecessor in interest. Both sides have therefore had to rely almost wholly on documentary evidence, and deductions therefrom.

Plaintiff's accountant, with the assistance of written memoranda left by Albert W. Brown, first read into the records from Fletcher's books of account, and from other documents, some 4,000 items for which defendants were asked to account. These items, with simple interest to 1916, aggregated about $846,000, on the theory that plaintiff had a half interest in the city lots. Approximately $249,000 was eliminated by my interlocutory decree, holding that plaintiff had a one-quarter, not a one-half, interest in these lots. There were about 600 of these lots, in addition to the 16,000 acres of pine lands. In addition to the accounting proper, there are about 20 important controversies in the nature of separate litigations; each one having all of the importance and involving all of the difficultes and perplexities, of an ordinary lawsuit. Defendants' accounts as filed consist of two large loose-leaf land or lot ledgers, with a number of supplements, one for the pine lands and the other for the city lots, grouping and analyzing the items under investigation. The contents of these accounts and the rulings of the master in connection with the items listed are summarized in Exhibits 3000 to 3008, inclusive, annexed to the

283 F.—17

master's report. The items allowed by the master, with interest to March 28, 1916, aggregate $359,899.23. All parties have filed exceptions. The following are the questions raised by these exceptions:

[1] *Nature of Fletcher's Trusteeship.*—Upon this question, counsel for the parties, before the master, made an exhaustive research of the authorities, and argued at length their respective contentions. Counsel for the plaintiff contended that Fletcher, as surviving partner after White's death, stood in a fiduciary relation to the heirs and representatives of White with respect to the latter's one-fourth share of the partnership property, while counsel for the defendants contended that the status of Fletcher was only that of a "metaphorical" trustee. In my opinion, filed January 6, 1916, and in the decree entered pursuant thereto, February 7, 1916, I held that Fletcher in his lifetime was a trustee, and that the defendants since his death are trustees, of said one-fourth interest, and of the direct proceeds thereof in any form, whether moneys, securities, lands, or other property of any nature. The authorities sustain this holding. Mechem on Partnership, § 268; 2 Lindley on Partnership (2d Am. Ed.) p. 521 et seq.; 2 Rowley on Partnership, § 617; Heath v. Waters, 40 Mich. 457; Blodgett v. Muskegon, 60 Mich. 580, 27 N. W. 686; Killefer v. McLain, 78 Mich. 249, 44 N. W. 405; Porter v. Long, 136 Mich. 150, 98 N. W. 990, 4 Ann. Cas. 177; Drueke v. Boylon, 160 Mich. 522, 125 N. W. 416; Murray v. Keeley Institute, 190 Mich. 295, 157 N. W. 87; Galbraith v. Tracy, 153 Ill. 54, 38 N. E. 937, 28 L. R. A. 129, 46 Am. St. Rep. 867; Andrews v. Stinson, 254 Ill. 111, 98 N. E. 222, Ann. Cas. 1913B, 927; Valentine v. Wysor, 123 Ind. 47, 23 N. E. 1076, 7 L. R. A. 788; Western Securities Co. v. Atlee, 168 Iowa, 650, 151 N. W. 56; Fried v. Burk, 125 Md. 500, 94 Atl. 86; Tillotson v. Tillotson, 34 Conn. 335; Smith v. Walker, 38 Cal. 385, 99 Am. Dec. 415; Ogden v. Astor, 4 Sandf. (N. Y.) 311; Preston v. Fitch, 137 N. Y. 41, 33 N. E. 77; Russell v. McCall, 141 N. Y. 437, 36 N. E. 498, 38 Am. St. Rep. 807; Joseph v. Herzig, 198 N. Y. 456, 92 N. E. 103; Tennant v. Dunlop, 97 Va. 236, 33 S. E. 620.

Counsel for defendants refer to the following language of Lord Westbury in Knox v. Gye, L. R. 5 H. L., 656 (676):

"The application to a man who is improperly and by metaphor only, called a trustee, of all the consequences which would follow if he were a trustee by express declaration—in other words a complete trustee, holding the property exclusively for the benefit of the cestui que trust—well illustrates the remark made by Lord Mansfield that nothing in law is so likely to mislead as a metaphor."

From this characterization as metaphorical of the status of a surviving partner as a trustee, defendants' counsel argue that the relation of Fletcher in his lifetime, and the defendants since his death, with respect to this one-fourth share, was not that of an actual trustee, as that term is ordinarily understood in law and in equity. This language of Lord Westbury has been criticized in a number of decisions. In Tennant v. Dunlop, supra, it is said, with reference to this language:

"The language of Lord Westbury is, therefore, to be construed, we take it, with reference to the particular question in his mind for decision, whether a surviving partner, as respects the representative of a deceased partner, is a complete trustee, and liable to all the consequences resulting from that re-

lation, or is only a quasi trustee. ✱ ✱ ✱ Whether or not a surviving partner is inaccurately called a trustee does not matter. There is no magic in law in a name. It is not the name which determines his relation to the representative of the deceased partner, creates his duties, and measures his responsibility, but his dominion over the partnership property, and his obligations with respect to it."

The decree entered February 7, 1916, limits the accountability of the defendants to the "direct" proceeds of this one-fourth share, and this is the rule which has been followed in the accounting had before the master. Hence, as said in the language last quoted, it is unimportant what name is applied to Fletcher's status as surviving partner, whether an actual trustee, or merely a fiduciary for certain purposes. In his discharge of the duties devolving upon him as surviving partner, he must be governed by certain of the rules applicable to an actual trustee; that is, he was not entitled to himself make a profit out of his handling of this one-fourth share, he had no right to take it, or any part of it, at a valuation, and he was under the duty to conserve, to keep and render proper accounts, to fully disclose, and to act in the utmost good faith towards White's heir at law and his personal representative.

The practical application of this rule is principally important, in the accounting had before the master, in determining the accountability for the plaintiff's one-fourth share of the stumpage cut from partnership lands. I am satisfied that the master reached the correct result on this feature, and that the plaintiff is entitled to a full one-fourth of the realized avails of this stumpage.

On the other questions, which have been based upon the fact of the trusteeship of Fletcher, and the defendants, namely, compound interest or rests, and special allowance for expenses and counsel fees to plaintiff, I have ruled against the contention of the plaintiff, for reasons hereinafter stated. I therefore fully sustain the master upon this subject, and overrule plaintiff's exception No. 1, and defendants' exception No. 1.

[2] *To Whom Should Defendants Account?*—By the opinion of January 6, 1916, and the decree of February 7, 1916, the issues as between the intervening plaintiff, Weston, administrator d. b. n. of White's estate, and plaintiff, involving the question whether the property owned by the partnership was real estate or personal property at the time of White's death, was reserved for future consideration and determination. By agreement of the parties, this question was argued before the master, and he held that, on the dissolution of the partnership by White's death, his share of the partnership lands descended as real estate to his heir at law, Frances M. Brown, and that his share of the personal property vested as such in his administrator. Mrs. Brown has since died, leaving a last will by which she gave all her property to her husband, Albert W. Brown, who was the original plaintiff in this suit. The latter has since died, and the suit now stands revived in the name of his executor. A large part of the partnership real estate had been converted into money at the time of the commencement of this suit, and what remained as real estate at that time has, by agreemen of the parties, been treated as converted at an agreed valuation. The suit by the plaintiff is now, therefore, for a money decree for the

proceeds of what was real estate at the time of White's death. As to what was personal property at that time, it is conceded that accountability must be to the intervening plaintiff, Weston.

As between the plaintiff and the intervening plaintiff, I am convinced that the contentions of the former are correct; that this partnership was not one formed merely for the purpose of dealing in real estate; that White's share in the partnership lands, therefore, descended on his death to his heir at law as real estate. My conclusion in this regard is supported by the great weight of authority, and particularly by the Michigan decisions, which must be held controlling. Shearer v. Shearer, 98 Mass. 107; Darrow v. Calkins, 154 N. Y. 503, 49 N. E. 61, 48 L. R. A. 299, 61 Am. St. Rep. 637; Perin v. Megibben, 53 Fed. 86, 3 C. C. A. 443; Way v. Stebbins, 47 Mich. 296, 11 N. W. 166; Comstock v. McDonald, 126 Mich. 142, 85 N. W. 579.

[3] White's one-fourth interest in these lands having descended as real estate to his heir at law, Mrs. Brown, the proceeds thereof must now be accounted for to the plaintiff; their subsequent conversion into money has not changed the heir's right thereto. In Cole v. McFall, 48 Mich. 227, 12 N. W. 166, it was said:

"The land fell to the daughters under the law of inheritance, subject to the widow's dower, and the sale made afterwards had no effect to blend it with the estate which was left in the form of personality. It was already the real estate of the persons entitled, and the sale was a sale of their lands, and as between them the proceeds were their moneys in the proportion of their respective ownerships, and not moneys belonging to the mass left in the form of personal property and disposable under the statute of distributions."

[4] I am also satisfied that Albert W. Brown, as the sole legatee and devisee under the will of his deceased wife, Frances M. Brown, had the right to institute this suit in his individual name. The rule is that such a legatee and devisee may bring suit in his own name to recover property from a third person withholding it from him. Ewers v. White's Estate, 114 Mich. 266, 72 N. W. 184. I therefore fully sustain the master on these questions, and overrule all of intervening plaintiff's exceptions.

[5] *Defendants' Claims Based upon Mrs. Eliza White's Release or Conveyance of Her Dower in Her Deceased Husband's Share of the Partnership Lands, and upon Her Assignment of Her Statutory Rights in Her Husband's Estate.*—The master held that, because the estate of Mrs. White is not a party to this suit, these claims of the defendants cannot be here passed upon. Defendants' claim, based upon her release or conveyance of her dower to Fletcher, is not a question, in my opinion, in which her estate is interested. If defendants' claim in this regard should be sustained, the result would be to reduce the plaintiff's recovery, and not to affect at all any recovery in which Mrs. White's estate could under the holding here made be interested. However, I am satisfied that defendants' claim cannot be sustained. No dower interest was in Mrs. White's lifetime ever formally assigned to her, and in my opinion, under the authorities, any claim thereto ended at her death. 14 Cyc. 1009; 2 Kerr on Real Property, § 1041.

The document signed by Mrs. White under date of August 19, 1880, although I construe it as an intended conveyance, not a mere release,

as claimed by plaintiff, was ineffectual to create any interest which can now be asserted by the defendants. I therefore sustain the general result reached by the master on this subject and overrule defendants' exceptions.

[6] As to the defendants' claims, based upon the instrument signed by Mrs. White, Exhibit 2265, under date July 7, 1891, this instrument expressly purports to have been given as security for money advanced or to be advanced. Mrs. White's estate is not a party to this suit. Therefore what her estate may receive as an heir at law of her husband is dependent upon what the probate court of Suffolk county, Mass., may allow as administration expenses, debts, etc., of William White's estate. Until those matters are determined, it is uncertain what, if anything, will be payable to Mrs. White's estate. Therefore I am satisfied that defendants' claim based upon this instrument must be made in probate court, and that it is not a proper subject of offset in this suit. 2 Rowley on Partnership, § 661; 30 Cyc. 714; Colgin v. Cummins, 1 Port. (Ala.) 148. The defendants' exceptions 2 and 3, based upon this claim, are therefore overruled.

*Defendants' Motion to Dismiss.*—When I announced my decision in respect to the matters covered by defendants' exceptions 2 and 3, defendants' counsel called attention to the fact that he had reserved the right, in case of such exceptions being overruled, to renew his motion to dismiss the bill of complaint on the ground of misjoinder of parties and causes of action. Such motion was thereupon renewed and overruled by me.

[7] *Effect of Recital of Consideration in Deeds.*—On the accounting before the master, the plaintiff claimed that, where Fletcher gave a deed of partnership property, the deed reciting the receipt of a certain consideration, such recital constituted prima facie evidence of its receipt by Fletcher, and put the burden upon the defendants to show that he did not, if such was the fact, receive the amount named. The master sustained the plaintiff's position, and the authorities support this holding. 13 Cyc. 613, 614; Fowlkes v. Lea, 84 Miss. 509, 36 South. 1036, 68 L. R. A. 925, 2 Ann. Cas. 466; 3 Jones on Ev. § 469. I therefore overrule defendants' exception No. 4.

[8] *Fletcher's Books and Records.*—During the argument before the master, counsel for all parties agreed that, unless specifically objected to, the master might consider as in evidence all statements and entries contained in any of the exhibits which appeared genuine and credible, although technically hearsay. It was agreed that all parties were relying, and were willing to permit the others to rely, to a reasonable extent upon statements and entries of this nature, in view of the peculiar circumstances of the case and the death of all persons having personal knowledge of the facts involved. The right was reserved to make special objection to any incompetent entry, statement, or declaration.

Plaintiff claimed the right to object, when desired, to any entry in Fletcher's books as a "self-serving declaration," without waiving his own right to use the books as "admissions against interest." Defendants admit that Fletcher was not a skillful bookkeeper. His handwriting was very illegible, he had a way of making erasures and correc-

tions with a pen or knife, instead of cross or correcting entries, and apparently went on the principle that, if the books were intelligible to him, it was all that could be required. Some of the erasures and corrections in the books have been made the basis of an attack upon his good faith.

The master had the books before him for many months, investigating the thousands of items involved in the accounting. He thus acquired a general acquaintance with the books, and reported that innocent alterations were so common and Fletcher's lifelong methods so peculiar that the books could not be judged by ordinary rules. The irregular and unusual were to him regular and usual. Errors to his disadvantage are as common as errors to his advantage. He kept his records with all the accuracy that might be naturally expected from a man of his temperamental peculiarities, acting honestly. The books produced were used by Fletcher as a basis for numerous and extensive business transactions throughout many years, and were the only books that he kept during many years of active and successful business life.

I see no reason for excepting these books from the general rules applicable to books of account, and therefore affirm the master's holding that they are to be received as prima facie evidence of the facts and figures therein contained. Plaintiff's fifth exception is overruled.

[9] *Effect of Settlements between Fletcher and White.*—Plaintiff seeks to recover for certain items antedating some of the settlements and claimed to have been inadvertently omitted therefrom. Plaintiff contends that the burden of proof is upon the defendants to show the settlement of such items. This claim must be overruled. These settlements (with a few unimportant exceptions, agreed upon by counsel) were obviously intended to embrace all transactions of joint interest prior to their dates. White was at Alpena every year from 1868 to 1872, inclusive. While there he examined Fletcher's account books and land books, and also the land contracts upon which payments were endorsed. He spent enough time at Alpena to notice physical changes in the property. He was an experienced business man, and ought to have been able to discover any inaccuracies in the accounts and settlements. The correction of an error in one of the settlements indicates that he was vigilant in checking the accounts. By attempting to open the settlements now, and by assuming to know more about the affairs of the parties than they themselves knew, the court will risk the perpetration of injustice greatly exceeding the possible injustice which might result from accepting the settlements as they stand with their inadvertent errors, if any. Each settlement is evidenced by a written account over the signatures of the parties. It is a well-settled rule that settlements of this kind should not be disturbed after the lapse of so many years, except on clear and convincing proof. Chappedelaine v. Dechenaux, 4 Cranch, 306, 2 L. Ed. 629; Stearns v. Page, 7 How. 819, 12 L. Ed. 928; Willet v. Fister, 18 Wall. 96, 21 L. Ed. 804; Loveland v. Peter, 108 Mich. 154, 162, 163, 65 N. W. 748; Valentine v. Wyser, 123 Ind. 47, 23 N. E. 1076, 7 L. R. A. 788. No satisfactory evidence has been produced in this case to justify a court (groping in the dark 50 years after the events in question) to attempt to revise settlements made by two mature and experienced business men both of whom had

the opportunity to learn and understand the facts involved. I therefore affirm the ruling of the master on this subject, and overrule plaintiff's second exception.

*Balances on Settlements.*—The master allowed the following items, representing balances claimed to be due on certain settlements made between White and Fletcher:

|  | Principal. | Interest. | Total. |
|---|---|---|---|
| Balance due White on the 1867 settlement.. | $3,355.52 | $9,833.35 | $13,188.87 |
| Supplementary item growing out of 1867 settlement .................................... | 575.67 | 1,687.00 | 2,262.67 |
| Balance growing out of 1871 settlement..... | 2,507.07 | 6,701.90 | 9,208.97 |
|  | $6,438.26 | $18,222.25 | $24,660.51 |

Defendants showed that three notes for these amounts and representing these balances were given by Fletcher to White. They offered evidence tending to prove that these notes had been paid, and claimed that, even if this evidence were not conclusive, the notes should be held barred by the statute of limitations.

[10] I find it unnecessary to determine whether the statute of limitations should apply, because I am able to find as a fact that the notes were paid. The record contains two statements prepared by A. W. Brown in the nature of a history of the financial transactions between White and Fletcher. One of these was made in 1884, and the other in 1899. The long period which elapsed between them would have given Mr. Brown ample opportunity to correct any inadvertent error. He stated specifically that these two notes were paid, and described in detail the method of payment. Plaintiff relies on the fact that there is nothing in the Fletcher books to show payment, and contends that Mr. Brown's admissions are not conclusive. Plaintiff Weston further claims that Mr. Brown's admissions are not binding on the White estate.

All the evidence shows that Mr. Brown was the principal representative for many years of all of the predecessors in title of the various plaintiffs. He was the husband of Frances M. Brown, who was White's heir at law. Later he succeeded to the title of the real estate as her heir at law. He was for a considerable period the administrator of White's estate, and before his appointment as such he was the accredited agent and attorney in fact of the administrator, in full charge of the prosecution of the litigation. He had control, both of the investigation and of the actual trial of the case. His admissions were made in the course of and as a part of the transactions covered by the agency, and in connection with and as a means of promoting the interests of his principals. These admissions are therefore competent against his principal, the estate of William White. 2 Wigmore on Evidence, § 1078.

These admissions are even more clearly competent against the plaintiff Grant, who represents the estate of Albert W. Brown himself, and the other plaintiffs, who are all the successors in interest of Albert W. Brown. The record so clearly shows that Albert W. Brown had both the opportunity and the disposition to make a full investigation of the circumstances that I consider his admissions against interest as of very

great weight. Certain other letters and documents, offered for other purposes, and which are perhaps technically incompetent to prove the truth of Albert W. Brown's admissions, furnish very persuasive corroborative evidence. I therefore find that the balances due on the 1867 settlements were paid by Fletcher's notes, and that these notes were afterwards fully paid.

[11] In regard to the $2,507.07 note given on the 1871 settlement, the books are also silent; but, in view of Fletcher's methods of bookkeeping, that fact has little significance. There are no admissions by Brown in regard to this note, but the note itself was found among the papers of George N. Fletcher by defendants' accountants, with the signature erased by diagonal pen lines, in a manner which has always been a common method of canceling a paid note. This fact, and the fact that Fletcher was always responsible, and that Brown had both the power and disposition to enforce payment of this note, if it had not already been paid, justify me in finding as a fact, that it had been paid. I therefore allow defendants' exceptions numbered 5 and 6, thereby reversing and setting aside so much of the master's report as is found under the heading: "10. Notes evidencing Balances on Settlements."

[12] *Rogers' Notes.*—During White's lifetime, he borrowed $5,500 from Daniel H. Rogers, of Boston, giving his notes, for $5,000 and $500, respectively. These notes were bought by Fletcher, and were duly proved and allowed against White's estate in the probate court. Defendants now seek to set them off against plaintiff's claim. Plaintiff contends that a set-off of this nature is not proper. A court of equity, in a case of this kind, should apply with great liberality the doctrine of equitable set-off. Central Appalachian Co. v. Buchanan (C. C. A. 6th) 90 Fed. 454, 33 C. C. A. 598; Scammon v. Kimball, 92 U. S. 362, 23 L. Ed. 483; Carr v. Hamilton, 129 U. S. 252, 9 Sup. Ct. 295, 32 L. Ed. 669; Scott v. Armstrong, 146 U. S. 499, 13 Sup. Ct. 148, 36 L. Ed. 1059; North Chicago Rolling Mill Co. v. St. Louis Ore & Steel Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565. I therefore affirm the master's ruling on this issue, and overrule the plaintiff's sixth exception.

[13] *Right of Fletcher to Make Profits from Timber—Stumpage Prices.*—During the period from 1879 to 1889 the firm of Fletcher, Pack & Co., composed of George N. Fletcher, Albert Pack, and Frank W. Fletcher, carried on lumbering operations, and cut timber from the partnership lands, which was manufactured into lumber and sold. During the period from 1890 to 1897, the concern known as George N. Fletcher & Sons, which as a result of the decision of the Michigan Supreme Court in Fletcher v. Fletcher, 197 Mich. 68, 163 N. W. 488; Id., 206 Mich. 153, 172 N. W. 436, and 214 Mich. 12, 182 N. W. 1, was actually George N. Fletcher individually, also carried on lumbering operations, cutting timber from partnership lands, manufacturing it into lumber and selling it. The plaintiff claims the right to a one-fourth share of the amount realized by Fletcher from this partnership timber, being the difference between the proceeds of the lumber manufactured and sold therefrom and the cost of cutting and manufacturing. The defendants claim that the plaintiff's recovery in this regard is limited

to the fair value of the timber as stumpage. The master sustained the plaintiff's contention. I am convinced that his holding is correct.

Fletcher, as surviving partner, and as such occupying the status of a trustee, with respect to the plaintiff's one-quarter interest in this timber, had no right to make an individual profit out of it. The rule is universal that a trustee cannot deal with trust property at a profit to himself. Story's Equity Jurisprudence (13th Ed.) §§ 1258, 1261–1264; Docker v. Somes, 2 Mylne & K. (Eng.) 655; Heath v. Waters, 40 Mich. 457; Kimball v. Lincoln, 5 Ill. App. 316; Young v. Scoville, 99 Iowa, 177, 68 N. W. 670; Nebraska Power Co. v. Koenig, 93 Neb. 68, 139 N. W. 839; Dovey v. Dovey, 95 Neb. 624, 146 N. W. 923; Brown v. Lambert, 33 Grat. (Va.) 256; Oliver v. Piatt, 3 How. 333–401, 11 L. Ed. 622. Fletcher, as surviving partner, had no right to take this partnership stumpage, or any part of it, at a valuation. 2 Lindley on Part. (2d Am. Ed.) p. 592; 1 Collyer on Part. (6th Ed.) § 331; Parsons on Part. (4th Ed.) § 348; Story on Part. (7th Ed.) § 351; 3 Kent, Com. (14th Ed.) note y, p. 63; Crawshay v. Collins, 15 Ves. 218–227; Featherstone v. Fenwick, 17 Ves. 298, 308, 309; Sigourney v. Munn, 7 Conn. 11, 20, 21; Ogden v. Astor, 4 Sandf. (N. Y.) 311; Walker v. House, 4 Md. Ch. 39; Freeman v. Freeman, 136 Mass. 260.

The fact that Fletcher was the owner of a three-quarter interest in this timber did not give him the right to lumber it. His cutting of it was none the less a conversion. The fact that the timber was liable to destruction by fire, etc., was no sufficient reason in law to authorize his cutting of it. Clow v. Plummer, 85 Mich. 550, 48 N. W. 795; Hennes v. Hebard & Sons, 169 Mich. 670, 135 N. W. 1073. Even where a trust relation does not exist, and the one wrongfully cutting the timber is a mere tort-feasor, the measure of recovery is the difference between the amount received for the timber manufactured into lumber and the expenses of cutting and manufacturing. Where the cutting has been knowingly willful and wrongful, deduction of expenses has been disallowed. Symes v. Oliver, 13 Mich. 9; Final v. Backus, 18 Mich. 218; Grant v. Smith, 26 Mich. 201; Winchester v. Craig, 33 Mich. 205; Isle Royale Mining Co. v. Hertin, 37 Mich. 332, 26 Am. Rep. 520; Tuttle v. White, 46 Mich. 485, 9 N. W. 528, 41 Am. Rep. 175; Gates v. Rifle Boom Co., 70 Mich. 309, 38 N. W. 245; Moret v. Mason, 106 Mich. 340, 64 N. W. 193; Anderson v. Besser, 131 Mich. 485, 91 N. W. 737; Gustin v. Embury-Clark Lbr. Co., 145 Mich. 101, 108 N. W. 650; Hennes v. Hebard & Sons, 169 Mich. 670, 135 N. W. 1073; Woodenware Co. v. United States, 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230; Pine River Logging Co. v. United States, 186 U. S. 279, 22 Sup. Ct. 920, 46 L. Ed. 1164; Union Naval Stores Co. v. United States, 202 U. S. 491, 36 Sup. Ct. 728, 50 L. Ed. 117; Trustees of Dartmouth College v. International Paper Co. (C. C.) 132 Fed. 92; Beech-Wood Ice Co. v. American Ice Co. (C. C.) 176 Fed. 435; Smith Timber Co. v. Auld, 218 Fed. 824, 134 C. C. A. 512; United States v. Hammond (D. C.) 226 Fed. 849; Herdic v. Young, 55 Pa. 176, 93 Am. Dec. 739; Sutherland on Damages (4th Ed.) § 1154; Sedgwick on Damages, 903, 915. Hence I am convinced that the master adopted the correct rule governing the defendants' accountability for this timber.

Both parties filed exceptions, based upon the claim that the method

used in determining the amount realized by Fletcher from this stump-age is erroneous. The schedules, explaining the method used and the criticisms of this method, are all attached to the master's report, and are thus available for the purpose of explaining the position of the parties. To examine the position of the parties in this regard would involve a careful analysis of the method used, and the criticisms of it, and I am advised that counsel for the parties and their accountants spent a very large amount of time in reaching the result which is re-ported by the master. Therefore I have concluded to simply sustain the master's report, overruling the exceptions based upon the method used.

[14] *Could Fletcher Convey?*—The lands involved under this ques-tion are those covered by the John Campbell deed, Exhibits 11A and 11B, which vested title in Fletcher, White, and Campbell, as copart-ners, under the firm name of Thunder Bay Lumber Company. Legal title to an undivided interest in these lands was thereby vested in White, and devolved upon his heir at law on his death. Fletcher ac-quired the James Campbell interest in these lands. Fletcher gave deeds of certain of these lands in his own name and received the pro-ceeds. The question is whether the defendants are accountable for the proceeds received on such conveyances. The plaintiff's position is that on White's death the entire equitable interest in these lands vested in Fletcher, for the purpose of winding up the partnership affairs, and hence that his conveyances carried the entire beneficial interest, leaving only the naked legal title in White's heir at law, which legal title the heir at law could have been compelled to convey to the purchasers with-out consideration; that the entire consideration for these conveyances came into Fletcher's hands as surviving partner, and hence that the de-fendants are accountable for the plaintiff's share thereof. This posi-tion is supported by the authorities. Shanks v. Klein, 104 U. S. 18, 26 L. Ed. 635.

The Michigan cases recognize a sort of legal title in a surviving partner, Moran v. Palmer, 13 Mich. 368; Barry v. Briggs, 22 Mich. 201; Pfeffer v. Steiner, 27 Mich. 537; Godfrey v. White, 43 Mich. 171, 5 N. W. 243; Killefer v. McLain, 78 Mich. 249, 44 N. W. 405. Fletcher, as surviving partner, purported to sell and convey the entire interest in these lands, and occupying, as he did, the status of a trus-tee as surviving partner, the defendants are accountable for the plain-tiff's share of such proceeds. I therefore overrule defendants' excep-tions Nos. 11 and 12.

*Doctrine of Confusion of Goods.*—Plaintiff claims that the evidence shows that Fletcher mingled collections from the sale of partnership property with collections of his own funds, that he confused his in-dividual stumpage with partnership stumpage, and that in all such cases plaintiff is entitled to the entire receipts unless a clear identifica-tion and separation can be made. Without discussing the general rule, I agree with the master that there is no occasion for its application to the present case. As stated by the master, the defendants and their accountants and counsel, in the face of many difficulties, have suc-ceeded in presenting a complete and honest accounting. The account as presented in fact represents the actual proceeds of the partnership

property, together with such profits as accrued through its increase in value prior to its sale, with interest thereafter. Everything is accounted for with reasonable certainty and particularity. There is therefore no occasion to apply the doctrine of confusion, or any other harsh or arbitrary doctrine. Plaintiff's ninth exception is overruled.

*Prentiss Lands.*—This branch of the case involves the construction and effect of certain transactions between George Prentiss and the predecessors in interest of the parties to the present suit. These old transactions were the subject of complicated litigation, which ended about 40 years ago in the decision of the Supreme Court of Michigan, reported as Alpena Lumber Co. (Beekman) v. Fletcher, 48 Mich. 555, 12 N. W. 849. The parties now disagree as to the effect of the old litigation upon the rights of Fletcher, White, and Campbell, and it has been necessary to make an exhaustive study of the old case in order to determine its effect upon the present accounting. Defendants claim that, although this was originally partnership land, and although Fletcher afterwards disposed of this land and timber, his title was that of a purchaser from Prentiss who had himself purchased White's interest. That this land and timber should therefore be excluded from the accounting.

This subject involves all of the pine lands in towns 32—3 and 32—4. There are three branches of the subject, viz.: (a) Defendants' accountability for the lands covered by the decree of the Michigan Supreme Court in the old litigation and for the timber cut by Fletcher from these lands. (b) Defendants' liability for other lands and timber in township 32—4. (c) Defendants' liability for timber cut by Prentiss on these lands.

Question (b) was decided by the master in plaintiff's favor, and question (c) in defendants' favor. I affirm the decision of the master in respect to both of them. This necessitates the overruling of plaintiff's exception 10 and of defendants' exception 13, in so far as it refers to defendants' requests 12 to 15, inclusive, of group B–V.

The principal question in dispute regarding the Prentiss lands is that mentioned under subdivision (a) above. On this subject, I must reverse the master's findings, and allow defendants' exceptions, for the following reasons:

The transactions covering the Prentiss lands are very complicated and to understand the actual intentions of the parties requires the most careful and painstaking analysis of their acts and of the letters which passed between them. Mr. Brown, Mrs. Brown, and Mr. Spalding, the administrator of the White estate, were in a much better position than we are to investigate the facts and to decide the questions which now seem most difficult of decision. They all joined on March 6, 1876, in executing an agreement with Prentiss and others (Exhibit 561). This contract purported to ratify the transaction by which Fletcher had agreed to sell White's interest to Prentiss at $7.75 per acre. Later in the Prentiss litigation, this contract was set up in the bill of complaint. Mr. and Mrs. Brown and Spalding, as administrator, answered the bill, and in their answer tendered a conveyance of the White lands to Prentiss' assignee, upon payment of the unpaid part of the purchase

money. The decree of the Supreme Court of Michigan directed such a conveyance, and this decree was afterward recorded in the office of the register of deeds, and as so recorded had the effect of a conveyance. These facts help to convince me that defendants' theories in respect to the disposition of White's interest in these lands are correct, in so far as they involve the substitution for these lands of the agreed price of $7.75 per acre.

This leaves undetermined the question whether defendants are now liable for this $7.75 per acre, with interest. It appears that three notes, identified by their date and maturity as representing payment for the White and Campbell interest in the Thunder Bay Lumber Company lands, were delivered by Prentiss to Fletcher, and sent by Fletcher to James Campbell, on May 1, 1873. Apparently James Campbell kept these notes and used them for his own benefit, as if received for his own lands. I hold that defendants should have no credit on the present accounting because of the fact that these notes were sent by Fletcher to Campbell. I therefore find that defendants are not responsible for any of the lands named in the Prentiss decree, or for any of the proceeds thereof, except that defendants shall be charged with the sum of $4,193.62, together with interest thereon from March 6, 1876, amounting to $9,871.78 a total of $14,065.40, and a reduction of $4,985.51 from the amount found to be due by the master. I therefore allow defendants' exceptions 13 and 14, except in so far as they refer to defendants' requests for conclusions of law numbered 12 to 19, inclusive, of group B–V.

*Houses and Other Improvements.*—It is undisputed that Fletcher expended his own money in building houses and making other improvements on some of the vacant lots, for which defendants are required to account. The land and improvements were sold by Fletcher as a whole, and the defendants have apportioned the amount received. Plaintiff claims that defendants are generally accountable in such cases for the entire value of the land and improvements. The master finds that, as a general rule, during all the time in controversy, Fletcher, with White's knowledge and consent, spent his own money in building houses, docks, and other structures on company lots, and thereafter treated them as his own; that White made repeated visits to Alpena, during which time he saw Fletcher making improvements without charging for them, and collecting rents without crediting them to the Thunder Bay Lumber Company. The record shows no protest or objection by White and no demand for payment. In some cases the books clearly show that the money was furnished by Fletcher. In others there is no evidence who furnished it. There is no evidence that the Thunder Bay Lumber Company did so.

The master tried to adopt an equitable rule in each case. In the few instances where improvements were charged and rents collected, credited to the Thunder Bay Lumber Company, this course was followed in the accounting. In the larger number of cases, where Fletcher treated the lots as his own, paying for the improvements himself, defendants are either charged with the value of the lot in its vacant state at the time when the improvements were first made, or are credited with

ground rent until such time as the lot was sold. In each particular case the master selected, from among the alternatives, the one which seemed to be most equitable in view of the special circumstances of the case. I approve and confirm his findings in this respect, and overrule plaintiff's eleventh exception.

[15] *Fletcher House or Hotel Venture.*—This hotel was built in 1871 and 1872 on land for which I have held defendants accountable. The venture was a failure, resulting in a considerable loss. Defendants claim that White in his lifetime was financially interested in this venture, which plaintiff denies. The venture was outside the purpose of the partnership known as the Thunder Bay Lumber Company, as stated in the partnership articles. The stated purposes were the manufacture of lumber; but, after the early efforts in this regard were abandoned by the partners, the business settled down into the holding and disposing of the firm lands. In order to change that scope, by engaging in a venture such as the hotel project, the consent of each partner would have been necessary. 1 Rowley on Partnership, §§ 413, 416. As a matter of fact, the hotel appears to have been originally built as a joint-stock enterprise; subscriptions to the venture being taken, and payments made on account thereof. This was the form of the enterprise at the time of White's death in April, 1873. He was not a subscriber to this joint-stock enterprise. In 1874 a corporation was formed to own and operate the hotel, and this corporation was later wound up, and Fletcher bid in the hotel and other property.

To bind White to the venture, defendants rely on an entry made by Fletcher in the Thunder Bay Lumber Company's account on his books, purporting to be under date of December 20, 1872, which was before White's death, whereby he purported to cover the cost of the hotel as a charge against the Thunder Bay Lumber Company, and also to two charges of insurance premiums to the Thunder Bay Lumber Company, made by him on his books in August and September, 1872. Defendants rely, also, on certain other circumstances claimed to be corroborative, including a letter written by White, in which he speaks of "the hotel that we are building." Plaintiff denies that the charge of the cost of the hotel was actually made on the date it bears, and there is no evidence to show that White ever expressly assented to these charges. As above stated, his express consent was necessary to bind him. These book entries cannot, therefore, serve the purpose of establishing a special agreement by White in this regard. 4 Chamberlayne on Evidence, § 3127; Griecheimer v. Tanenbaum, 124 N. Y. 650, 26 N. E. 957. I therefore overrule defendants' exceptions Nos. 17 and 18.

[16] *Made Lands, etc.*—Certain of the partnership lands in Alpena fronted on the Thunder Bay river and others on the shore of Thunder Bay, an arm of Lake Huron. In the course of time, by one means and another, but without any particular expense to the Thunder Bay Lumber Company, the shoal waters near the shore were filled in, thus forming what has been called "made lands." Fletcher assumed ownership of this made or filled-in land, sold parts of it as owner, and in some instances credited the proceeds to the Thunder Bay Lumber Company. The defendants admit accountability for the made land front-

ing on the river, but claim that title to the made land on the bay shore—that is, outside the original meander line—was in the state, and hence that they are not accountable for its proceeds to the plaintiff. The plaintiff contends that the defendants are estopped from making this claim. The master sustained the plaintiff's contention.

The evidence shows that much of this made land was formed as a result of improvements made in aid of navigation. The rule is that a shore owner may make improvements in aid of navigation, out to the point of navigability. Dutton v. Strong, 1 Black, 1, 17 L. Ed. 29; Ills. Cent. R. R. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018; Illinois v. Ill. Cent. R. Co., 184 U. S. 77, 22 Sup. Ct. 300, 46 L. Ed. 440; Water Power Co. v. Water Commissioners, 168 U. S. 349, 368, 18 Sup. Ct. 157, 42 L. Ed. 497; Weems Steamboat Co. v. People's Co., 214 U. S. 345, 355, 29 Sup. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222; Yates v. Milwaukee, 10 Wall. 497, 19 L. Ed. 984; Ryan v. Brown, 18 Mich. 196, 100 Am. Dec. 154; Lorman v. Benson, 8 Mich. 18, 77 Am. Dec. 435; Rice v. Ruddiman, 10 Mich. 125; Lumber Co. v. Peters, 87 Mich. 498, 506, 49 N. W. 917, 24 Am. St. Rep. 175; Stuart v. Greanyea, 154 Mich. 132, 138, 117 N. W. 655, 25 L. R. A. (N. S.) 257; State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, p. 139; Concord Mfg. Co. v. Robertson, etc., Co., 66 N. H. 1, 25 Atl. 18, 18 L. R. A. 679; Gould on Waters (3d Ed.) § 179. Improvements thus made, including the made land formed as a result thereof, belong to the adjacent shore owner, under the doctrine of accretion. Moore on Foreshore, pp. 787, 788; Hall on Seashore, pp. 111, 112; Atty. Gen. v. Chambers, 4 De G. & J. 55, 17 Eng. R. C. 555; Seedkisto v. East India Co., 10 Moo. P. C. C. 140; Coleman v. Robertson, 30 Upper Canada Common Pleas, 609; Lovingston v. St. Clair County, 64 Ill. 56, 16 Am. St. Rep. 516; Id., 23 Wall. 46, 23 L. Ed. 59; Steers v. City of Brooklyn, 101 N. Y. 51, 4 N. E. 7; Ledyard v. Ten Eyck, 36 Barb. (N. Y.) 102. Title to this made land therefore was vested in Fletcher as surviving partner, and the defendants are accountable for the proceeds of plaintiff's one-quarter thereof.

[17] Even on the theory that the making of this made land was wrongful, as against the state, Fletcher was the surviving partner, and as such was in possession of this made land, handled it, and disposed of it, receiving the proceeds, and hence the defendants are estopped from denying accountability for the plaintiff's one-quarter of such proceeds. 1 Rowley on Partnership, § 177; Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732; Richardson v. Welch, 47 Mich. 309, 11 N. W. 172; Mitchell v. Fish, 97 Ark. 444, 134 S. W. 940, 36 L. R. A. (N. S.) 838; Barney v. Saunders, 16 How. (U. S.) 535, 543, 14 L. Ed. 1047. I therefore overrule defendants' exceptions Nos. 15 and 16.

[18] *Bowen Deed or Oldfield Mortgage Transaction.*—Title to the mouth of the river or city lands stood in the name of Fletcher. He sold certain of these lands to one Oldfield and took as security a mortgage in his own name for $10,000, covering property owned by Oldfield. Later Oldfield died, and his widow, who then became the owner of all the property he left, gave a second mortgage covering it to one Kennedy, which mortgage was assigned to Bowen, president of a

bank at Lockport, N. Y. The Kennedy or Bowen mortgage was foreclosed, and the property was bid in by Bowen, subject, of course, to the Fletcher $10,000 first mortgage. Later Bowen, desiring to sell certain of this property, and in order to complete the transaction, paid the Fletcher $10,000 first mortgage, $3,000 in cash, and by conveyance of the property covered by the Bowen deed, so called, which is in controversy here. This deed was given in 1871, and Fletcher then discharged the $10,000 mortgage, which, of course, he held for the partnership. It is the plaintiff's claim that he received the Bowen conveyance in payment of the mortgage, and therefore that defendants are accountable for the proceeds of this Bowen property. The master sustained plaintiff's claim.

The decree entered February 7, 1916, requires the defendants to account for the direct proceeds of partnership property in any form, whether moneys, securities, lands, or other property of any nature. The lands acquired by Fletcher by this Bowen conveyance were the direct proceeds of the partnership $10,000 mortgage. Hence defendants, as representatives of the surviving partner, Fletcher, must account for the proceeds of these Bowen lands. I therefore overrule defendants' exceptions Nos. 21 and 22.

[19] *Harrington and Jenny Mill Site.*—Fletcher, in behalf of the partnership, held a second mortgage covering what was known as the Jenny mill site. This second mortgage was foreclosed, but no sale was had. Pending the advertisement of sale on the foreclosure of the second mortgage, John Owen and others conveyed to Fletcher certain pine lands, and assigned to him certain mortgages, partly for a new cash consideration, not charged by Fletcher to the Thunder Bay Lumber Company, and apparently also as security for the amount due on the second mortgage, because Fletcher made an entry on his books to that effect. Later the first mortgage was foreclosed, and the property was sold to third persons, and no redemption was made. Fletcher realized sufficient from the property deeded by Owen to repay his own direct investment in it, and also to pay the second mortgage. While his account shows other later charges against the debtors under the second mortgage, the rule is that, where neither the debtor nor the creditor has made any definite application of payments, a court will apply all payments according to the principles of justice, almost invariably applying them first to the oldest indebtedness, and then in sequence according to the dates of the respective items. U. S. v. Kirkpatrick, 9 Wheat. 720, 6 L. Ed. 199; Bank v. Surety Co., 130 Fed. (6 Cir.) 401, 64 C. C. A. 601, 66 L. R. A. 777; In re Hawks (D. C.) 204 Fed. 309; 213 Fed. 177, 129 C. C. A. 521; Columbia Digger Co. v. Rector (D. C.) 215 Fed. 618; U. S. Fidelity Co. v. Eichel, 219 Fed. 803, 135 C. C. A. 473; Youmans v. Heartt, 34 Mich. 397; Brewing Co. v. Rogers, 112 Mich. 112, 70 N. W. 445, 67 Am. St. Rep. 389; People v. Grant, 139 Mich. 26, 102 N. W. 226; Printing Co. v. Smedley, 155 Mich. 249, 118 N. W. 984; Van Sceiver v. King, 176 Mich. 605, 142 N. W. 1069; 30 Cyc. 1243, 1244. The second mortgage was the oldest indebtedness, and under the facts shown by the evidence, justice requires the application of the proceeds of the property covered by the Owen conveyance in

payment of this mortgage. I therefore overrule defendants' exceptions Nos. 19 and 20.

*Smith and Chamberlain Mill Site.*—This property is a part of the lands embraced within the terms of the interlocutory decree. The proof submitted before the master showed that White and Campbell never made any claim to the property. Fletcher furnished his own funds to aid in the construction of a mill by Smith and Chamberlain, took a mortgage as security, and afterwards obtained title on default of payment by the mortgagors. Fletcher resold the property in 1864, but gave no credit to the Thunder Bay Lumber Company for the purchase price. The purchase-money mortgage was fully paid and discharged of record in May, 1868. White did not die until April 28, 1873. The account was therefore theoretically closed 8 years, and fully closed 5 years, before White's death, but at no time during these years, or before or after, was any credit given to the Thunder Bay Lumber Company, or any mention of the matter made in the settlements between the parties. During these years, Fletcher made at least three settlements with White and Campbell, viz. those of 1866, 1867, and 1871. It is inconceivable, if White claimed any interest in this property or its proceeds, that he could have permitted 8 years to elapse and three settlements to be made without claiming his rights. He was not ignorant of the facts, but was at Alpena every year, examined Fletcher's books, and could not have failed to observe the physical changes in the property, and its transfer from one owner to another.

There is only one conclusion that is consistent with these facts, viz. that all of the persons interested in the property had relinquished their interests to Fletcher or to Smith and Chamberlain before they conveyed to Fletcher. I therefore agree with the master that plaintiff's right to make any claim growing out of these transactions is foreclosed by 8 years of consent and acquiescence on the part of William White himself. That the most equitable course under such circumstances is to leave the parties as they left themselves, and that all of the items claimed by plaintiff in connection with this property should therefore be disallowed. Plaintiff's twelfth exception is overruled.

*Other Property in Block 76.*—The history of this property is similar to that of the Smith and Chamberlain mill. White not only permitted Fletcher unhindered to take the proceeds without giving any credit to the Thunder Bay Lumber Company, but also witnessed a document connected with the payment of $300 which was credited on Fletcher's books to his own account, and not to the Thunder Bay Lumber Company. I therefore affirm the master's ruling in this respect.

*Middle Ground.*—The "middle ground" was an island in the Thunder Bay river. Fletcher first sold the shore lots, without realizing that they would carry with them the island as a part of their riparian rights. He afterwards tried to sell the island separately, which led to litigation with the shore owners, in which Fletcher was defeated. See Fletcher v. Thunder Bay River Boom Co., 51 Mich. 277, 16 N. W. 645. He had accounted to the Thunder Bay Lumber Company for all sums received, but did not account for a note obtained on the second sale, which was apparently never paid, and which, because of the failure of the title,

had been given without consideration. Plaintiff claimed that this note should be accounted for. I affirm the master's decision, to the effect that defendants are not accountable for this item. Plaintiff's exception 13 is therefore overruled.

[20] *Interest, Rests, etc.*—On the hearing before the master, plaintiff claimed the right to compound interest, or (if that were disallowed) to at least one rest in the computation of interest as of the date of the commencement of the suit in 1908. On the hearing before me, it was suggested that the proper date for the rest would be the date of Fletcher's death in 1899. In my opinion, there is no basis either in law or equity for the allowance of compound interest, or for the employment of any rest in the computation of interest. Fletcher was not charged with the duty of investing any of the funds. His duty was to pay on proper demand. The measure of damages prescribed by law for the failure to pay a debt on demand is the payment of simple interest. 1 Sutherland on Damages (4th Ed.) § 311, pp. 970, 971. This rule would be especially applicable in a case where the amount demanded exceeded the amount due.

There are some exceptional cases, where something more than simple interest has been allowed as a substitute for a fund which has been made impossible of calculation through the act of the defendant. Even then, a court of equity will not enforce such payment as a penalty or punishment. Perrin v. Lepper, 72 Mich. 454, 556, 40 N. W. 859. As stated by the master, this is not a case where defendants have failed or refused to show what proceeds were realized from the property in Fletcher's hands at the time of White's death. I adopt as a part of my opinion the following quotation from the findings of the master:

"Defendants and their counsel have not been guilty of any unnecessary delay, and have shown the utmost good faith in submitting (notwithstanding many difficulties) a complete account of the disposition of all of this property, including the profits made by and before its sale. It increased very greatly in value between the date of White's death and the dates of the various items credited to plaintiff in the account. This increase of value constituted a large profit on the original investment, and plaintiff has received his full share of this profit. As each piece of property was turned into cash or its equivalent, plaintiff's right to any further profits was ended. In view of the continuing uncertainty in respect to the amount actually due, Fletcher was in no position to segregate the amount of money belonging to Mrs. Brown. It is not necessary in this case to adopt any arbitrary or harsh basis for an accounting. By the use of the voluminous data produced on the hearing, supplemented and explained by the painstaking efforts of the defendants, and of counsel for both sides, it is possible to determine with reasonable certainty the extent and monetary value of the property and its proceeds for which defendants are accountable. The only interest chargeable is simple interest at 7 per cent. for the period prior to September 28, 1887, at 6 per cent. for the period between that date and September 23, 1899, and at 5 per cent. thereafter."

Plaintiff's exceptions numbered 3 and 4 are therefore overruled.

In connection with this branch of the case, the parties argued before me at length the question of the alleged fraud on the part of George N. Fletcher. I find no such proof as could justify me in holding that George N. Fletcher was guilty of any fraud. There is no trace of fraud on the part of the defendants. When, in my first opinion and de-

283 F.—18

cree, I stated that George N. Fletcher had "wrongfully failed to perform" his duty as trustee, I did not thereby intend to charge him with any moral turpitude.

[21] *Plaintiff's Claim for a Special Allowance to be Paid by Defendants on Account of Expenses and Attorney's Fees.*—I am satisfied that the law does not permit me to make any such allowance. No extra allowance can be granted, in the absence of some special statutory authorization. 15 Corpus Juris, 148, citing Motion Picture Patents, Inc., v. Yankee Film Co., 201 Fed. 63, 119 C. C. A. 401 (C. C. A. 2d); In re Brooklyn, 148 N. Y. 107, 42 N. E. 413; Smith v. Trust Co., 215 Pa. 413, 64 Atl. 591; Com. v. Meyer, 170 Pa. 380, 32 Atl. 1044. As between party and party in a cause, the statutory fee bill fixes the amount of costs to be recovered. In re Paschal (Texas v. White) 10 Wall. (77 U. S.) 483, 19 L. Ed. 992, 996; Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, 1160.

[22] Contribution cannot be exacted from defendant on the theory that he is incidentally interested in the fund that has been recovered from him. Brown v. P. R. Co. (C. C. A. 3d) 250 Fed. 513, 524, 162 C. C. A. 529. Plaintiff relies on Geer v. Finn, 196 Mich. 738, 163 N. W. 20, and Perrin v. Lepper, 72 Mich. 454, 40 N. W. 859. Neither of these cases has ever been followed by the Supreme Court of Michigan in any similar case. They are distinguishable from the present case, and, even if they could not be distinguished, I do not think that they are sufficient to overcome the great weight of authority to the contrary in the federal courts. I therefore deny plaintiff's petition for special costs to be taxed against the defendants.

[23] *Claim of Defendants for Compensation.*—The defendants on the accounting presented a claim for compensation for Fletcher's services in his lifetime, and theirs since his death, in winding up the affairs of the partnership, and in handling plaintiff's share of the property or its proceeds. The master disallowed this claim. Ordinarily, a surviving partner is not entitled to compensation for services in winding up the partnership affairs. 2 Rowley on Partnership, § 637; Comstock v. McDonald, 126 Mich. 142, 85 N. W. 579; Id., 136 Mich. 489, 101 N. W. 55; Porter v. Long, 136 Mich. 150, 98 N. W. 990, 4 Ann. Cas. 177; Ruggles v. Buckley, 158 Fed. 950, 86 C. C. A. 154; 175 Fed. 57, 99 C. C. A. 73; Id., 177 Fed. 395, 101 C. C. A. 547; Id., 192 Fed. 907, 113 C. C. A. 299. I therefore overrule defendants' exceptions Nos. 7 and 8.

[24] *Allowance to Plaintiff's Counsel out of the Recovery.*—For reasons herein stated, I have disallowed plaintiff's petition for a special allowance against the defendants on account of counsel fees and expenses, except that I have decided to allow the plaintiff to include in his taxable costs the amounts paid by him as master's fees and as stenographers' fees. On the announcement by me orally of my decision in these regards, counsel for plaintiff made a motion before me in open court for an allowance out of the recovery in behalf of the plaintiff of, first, the amount expended or incurred on account of expenses in connection with the present litigation; and, second, reasonable counsel fees for the services by them performed in this litigation. These services have been very extensive, involving work for months at a time, extend-

ing over the 14-year period since the commencement of this suit. By reason of the work required, counsel have devoted their time exclusively to this litigation, during such extended periods, at the sacrifice of other business. They have also advanced the money necessary to carry on the litigation, with no hope of repayment, except through a successful recovery. The controverted questions have been most difficult, and counsel have devoted much time in research, in order to properly argue these questions. There have been no living witnesses to testify respecting the great mass of the facts, and it has been necessary for counsel to establish the essential facts by a careful arrangement and analysis of documentary evidence. Without these efforts of counsel, it is obvious that no recovery would have been had. During my experience, I have known of no case approaching this, especially in view of the difficulties. As hereinbefore stated, there have been involved in this one suit about 20 important controversies in the nature of separate litigations, each one having all the importance and involving all of the difficulties and perplexities of an ordinary lawsuit. I have thus briefly reviewed the services of counsel, in order that my allowance to them shall not be taken as a precedent for applications for such allowances in ordinary litigations.

The situation here may be likened to a derelict ship, as to which repeated efforts have been made to salvage it, and which is finally salvaged. While those making the earlier efforts have devoted time and labor, such efforts have proven fruitless. It is solely because of the later efforts that the ship is salvaged; and accordingly to the one furnishing the later efforts is due the greater reward. In this case, I am advised that a number of attorneys have at different times represented the plaintiff's side, and that considerable money has been loaned to prosecute the plaintiff's side, in the old litigation. These former services and loans proved without avail. It is because of the services of the present counsel, during the past fourteen years, and the money advanced to prosecute the present litigation, that the recovery is now had.

The rule is that it is entirely proper to make an allowance out of the recovery on a percentage basis to counsel for the successful party. 2 Foster's Federal Practice (6th Ed.) § 422. One of the plaintiff's counsel was sworn before me on the consideration of this question, and testified as to the amount of expenditures to carry on this litigation. I therefore allow out of the recovery the amount thus established.

Under the circumstances, I have concluded that an allowance to plaintiff's counsel, Messrs. Walter B. Grant, Harrison Geer, and Harold R. Martin, of 50 per cent. of the recovery, after first deducting the amount of expenditures above allowed, will be entirely proper, this allowance to be paid them jointly, they to make such division thereof between themselves as they may determine is fair.

As to an allowance to counsel for the intervening plaintiff, Weston, the services performed by them have not been nearly as extensive as those performed by plaintiff's counsel. It appears that Weston, as administrator d. b. n. of White's estate, actually represents only one-third of the recovery had in his name; that is, the one-third which will go to the estate of White's widow—the other two-thirds, which will go to Marion E. Brown, being represented by counsel for the plaintiff. I

have therefore decided that counsel for Weston should be allowed out of the recovery in his behalf his actual expenditures, and as counsel fees 50 per cent. of one-third of the balance of the recovery had in his name.

*Defendants' Motion for Costs.*—Defendants made and argued a motion that they be allowed taxable costs against plaintiff, or at least that the taxable costs be divided. This motion is denied, and the decree will allow to the plaintiff taxable costs, including amounts paid as stenographers' fees and master's fees.

The plaintiff's recovery, based on the master's report as herein modified, is the sum of $356,323.61, which includes interest to July 1, 1922, and the recovery of the intervening plaintiff is the sum of $14,473.88, which includes interest to that date.

A decree may be entered in accordance with this opinion.